158 P.3d 209

**LIBERTY INSURANCE UNDERWRITERS, INC., Plaintiff/Appellant,**

v.

**The WEITZ COMPANY, LLC; Senio Enterprises, Inc., dba Skunk Creek Iron Works; S Diamond Steel, Inc., Defendants/Appellees.**

No. 1 CA–CV 05–0859.

Court of Appeals of Arizona, Division 1, Department E.

March 27, 2007.

Kunz Plitt Hyland Demlong & Kleifield PC By Steven Plitt and Joshua D. Rogers, Phoenix, Asperger Associates LLC By Jeffrey J. Asperger, Chicago, IL, Attorneys for Plaintiff/Counterdefendant/Appellant.

Sanders & Parks, P.C. By David J. Damron and Melinda Cekander, Phoenix, Snell & Wilmer LLP By Brian J. Foster, Phoenix,

Attorneys for Defendant/Counterclaimant/Appellee The Weitz Company, LLC.

Gallagher & Kennedy By Glen Hallman, Phoenix, Attorneys for Defendant/Counterclaimant/Appellee S Diamond Steel, Inc.

Raymond Greer & Sassaman, PC By Randy L. Sassaman, Phoenix, Attorneys for Defendant/Counterclaimant/Appellee Senio Enterprises, Inc.

## OPINION

JOHNSEN, Judge.

¶ 1 Arizona law requires that certain property damage insurance policies conform to terms recited in a published form called the "Arizona Standard Fire Policy." By statute, however, "inland marine insurance" policies are exempt from the Arizona Standard Fire Policy requirements. In this case we consider whether a builder's risk insurance policy constitutes "inland marine insurance" and thereby is exempt from the Arizona Standard Fire Policy requirements. For the reasons that follow, we hold that the builder's risk policy at issue is an inland marine policy within the meaning of Arizona law to which the Arizona Standard Fire Policy requirements do not apply.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Appellant Liberty Insurance Underwriters, Inc. ("Liberty"), issued a commercial builder's risk insurance policy in connection with the construction of four dormitories by appellee Weitz Company, LLC ("Weitz"), for Arizona State University. The policy was issued to "Weitz Company, LLC/Arizona State University." By its terms, the policy was in effect from November 11, 2002 through July 11, 2003, and covered "Student Dorms" at the ASU campus on Thunderbird

Road in Phoenix. The policy included three warranty endorsements that, if effective, required the insured to maintain adequate fire extinguishers on the job site, to conduct a fire watch "during all welding operations or other hot processes" and to inspect the premises for fire hazards at the end of each workday. Each warranty endorsement provided that "[f]ailure to comply with this warranty will render this coverage null and void."

¶ 3 On June 2, 2003, a fire destroyed one of the dormitories while it was still under construction. After a dispute arose with Weitz regarding insurance coverage, Liberty filed a complaint for declaratory judgment. It sought an order holding that the policy did not cover the damage because Weitz had failed to abide by the terms and conditions of the three warranty endorsements.[1] Weitz answered and counterclaimed for an order that the policy covered the fire damage.

¶ 4 On November 23, 2004, Weitz moved for summary judgment on the complaint and counterclaim. Weitz argued that the warranty endorsements that Liberty contended barred coverage were void because they were inconsistent with the Arizona Standard Fire Policy.[2] Liberty countered that its policy was an inland marine policy exempt from the Arizona Standard Fire Policy requirements. Alternatively, Liberty argued that the warranty endorsements did not conflict with the Arizona Standard Fire Policy and were enforceable as a matter of law, or, if the warranty endorsements were unenforceable, that questions of fact remained concerning Weitz's compliance with other policy requirements.

¶ 5 In March and June 2005, the superior court issued minute entries granting Weitz's motion for summary judgment. Liberty filed a motion for reconsideration arguing that, at a minimum, issues of fact remained concern-

---

1. Liberty also named subcontractors Senio Enterprises, Inc., and S Diamond Steel, Inc. as defendants. We will refer to Weitz, Senio Enterprises, Inc. and S Diamond Steel, Inc. collectively as "Weitz."

2. *See infra* ¶ 10. We do not understand Weitz to complain that the endorsements as a general matter imposed unreasonable burdens on its construction operations. Indeed, as Liberty points

out, several of the obligations purportedly imposed by the endorsements are consistent with the terms of Weitz's subcontracts and/or regulations issued by the Occupational Health and Safety Administration. Instead, Weitz argues that Arizona law does not permit Liberty to impose those obligations as conditions of insurance under the policy it sold to Weitz.

ing whether the policy constituted inland marine insurance.[3] In support of its motion, Liberty attached an affidavit by William J. Warfel, Ph.D., CPCU, CLU, a professor of insurance and risk management at Indiana State University.[4] The superior court denied the motion for reconsideration.

¶ 6 Thereafter, the case was reassigned and a different judge considered additional filings and oral argument on Liberty's motion for clarification. The superior court denied Liberty's motion and entered judgment in favor of Weitz on the grounds that Liberty's policy covered the fire damage and that the three warranty endorsements were unenforceable as a matter of law. The court awarded each defendant damages on the counterclaim and dismissed Liberty's complaint with prejudice.[5] Liberty timely appealed.

## DISCUSSION

### A. General Principles of Insurance Policy Interpretation.

 ¶ 7 An insurance policy is a contract between the insurer and its insured. *Tolifson v. Globe Am. Cas. Co.*, 138 Ariz. 31, 32, 672 P.2d 983, 984 (App.1983). Thus, the interpretation of an insurance contract presents questions of law, which we review *de novo*. *State Farm Fire & Cas. Co. v. Rossini*, 107 Ariz. 561, 564, 490 P.2d 567, 570 (1971); *Liberty Mut. Fire Ins. Co. v. Mandile*, 192 Ariz. 216, 220, 963 P.2d 295, 299 (App.1997).[6]

 ¶ 8 Courts construe the written terms of insurance contracts to effectuate the parties' intent, *Tolifson*, 138 Ariz. at 32, 672 P.2d at 984, and "to protect the reasonable expectations of the insured," *Phoenix Control Sys., Inc. v. Ins. Co. of N. Am.*, 165 Ariz. 31, 34, 796 P.2d 463, 466 (1990). Insurance policy provisions must be read as a whole, giving meaning to all terms. *Nichols v. State Farm Fire & Cas. Co.*, 175 Ariz. 354, 356, 857 P.2d 406, 408 (App.1993). If the contractual language is clear, we will afford it its plain and ordinary meaning and apply it as written. *Almagro v. Allstate Ins. Co.*, 129 Ariz. 163, 164–65, 629 P.2d 999, 1000–01 (App. 1981); *Stephan v. Allstate Ins. Co.*, 26 Ariz. App. 367, 370, 548 P.2d 1179, 1182 (1976).

### B. The Arizona Standard Fire Policy.

¶ 9 Arizona Revised Statutes ("A.R.S.") section 20–1503 (Supp.2006)[7] provides that "[n]o policy of fire insurance covering property located in this state shall be made ... unless it conforms as to all provisions and the sequence thereof with the basic policy commonly known as the New York standard fire policy, edition of 1943." The statute designates the New York standard form as the "Arizona standard fire policy," A.R.S. § 20–1503(A), and provides that the director of the Arizona Department of Insurance shall maintain a copy of the standard policy on file, A.R.S. § 20–1503(C).

 ¶ 10 Because the warranty endorsements that Liberty contended barred coverage are not found in the Arizona Standard Fire Policy, Weitz's motion for summary judgment argued that the warranty endorsements were invalid under Arizona law, and therefore unenforceable. By law, however, inland marine insurance policies are exempt from the Standard Fire Policy requirements imposed by A.R.S. § 20–1503. The exemp-

---

3. At oral argument before this court, both Liberty and Weitz conceded that whether the policy constitutes inland marine insurance within the meaning of Arizona law is a question of law.

4. Warfel's affidavit concluded that the policy "constitute[d] inland marine insurance as opposed to property insurance." Alternatively, Warfel examined aspects of the policy that a factfinder could use to determine that the policy provided inland marine coverage.

5. Pending resolution of coverage issues, the parties had agreed to an applicable allocation of damages arising from the fire.

6. We review the superior court's grant of summary judgment *de novo*. *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003). We will affirm only if no genuine dispute exists regarding the material facts and Weitz is entitled to judgment as a matter of law. Id. at ¶ 13; *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990).

7. We cite to the current version of the statute, which is the same, but for renumbering, as the version in effect at the time of the events in question.

tion is found in A.R.S. § 20–1501 (2002), which states in its entirety: "This article shall not apply to vehicle, casualty, inland marine or ocean marine insurance, or reinsurance." In superior court, Liberty argued that since the builder's risk policy it issued to Weitz was an inland marine policy, the policy was exempt from the Arizona Standard Fire Policy requirements under section 20–1501, and the warranty endorsements therefore were enforceable.

## C. The Liberty Policy.

▮ ¶ 11 The parties agree that the policy Liberty sold to Weitz was a builder's risk policy. The declarations page of the policy contained the labels "Interest Builder's Risk" and "Scheduled Property Floater." [8] Nevertheless, the policy also contained language by which it might be said to announce itself as an inland marine policy. Attached to the declarations page of the policy were five pages of "General Terms and Conditions," the first page of which recited that "[t]he following general terms and conditions apply to all Commercial Inland Marine Coverage Forms." Following the General Terms and Conditions was a six-page form labeled "Builder's Risk & Installation Form."

¶ 12 The policy defined "Covered Causes of Loss" to mean "Risks of Direct Physical Loss to Covered Property except those causes of loss not covered." [9] It defined the "[c]overed [p]roperty" as:

(a) Property which will become a permanent part of buildings or structures which are shown in the Schedule;

(b) Scaffolding, construction forms and temporary structures.

This may be *your* property or the property of others for which *you* are legally liable.

In addition, the policy's "Attachment of Coverage" provided as follows:

We cover from the time the property is at your risk starting on or after the time this coverage begins, but we will not cover:

(a) After the owner or buyer accepts the property;

(b) When your interest ceases;

(c) Beyond sixty (60) days after completion of the project;

(d) When each building or structure is occupied for its intended purpose;

(e) When the property is leased or rented to others;

(f) When you abandon the construction with no intention to complete it; or

(g) When this policy expires or is cancelled, whichever occurs first.

(Emphasis omitted.) [10]

## D. Inland Marine Insurance and Builder's Risk Insurance.

¶ 13 No Arizona court has decided whether a builder's risk policy is fire insurance subject to A.R.S. § 20–1503, or if such a policy may constitute inland marine insurance and thereby be exempt from the Standard Fire Policy requirements pursuant to A.R.S. § 20–1501. Although at first blush it may seem unlikely that a policy issued for an urban construction project in the desert might constitute "marine insurance," there is considerable support for the proposition that a builder's risk policy such as that at issue here might constitute inland marine insurance.

▮ ¶ 14 Inland marine insurance is an outgrowth of marine insurance. 1 Eric Mills Holmes & Mark S. Rhodes, *Holmes's Appleman on Insurance* § 1.12, at 60–61 (2d ed.1996) [hereinafter *Holmes's Appleman on Insurance* ]. "Marine insurance relates fundamentally to one type of risk which is the insurance of ships and their cargoes against loss . . . ." Id. at 59. Inland marine insurance, however, is not limited to water-borne

8. Generally speaking, a "floater" insurance policy covers property regardless of a change in geographical location of the property. 1 Eric Mills Holmes & Mark S. Rhodes, *Holmes's Appleman on Insurance* § 1.12, at 61 (2d ed.1996); *see also infra* note 14.

9. No party suggests that the express terms of the Liberty policy as a general matter excluded coverage for fire damage to "covered property."

10. The Liberty policy also provided that absent Liberty's consent, coverage "shall be suspended while the premises are occupied."

cargo or vessels. An inland marine policy may cover "all manner of risks to goods" in the possession of a carrier or custodian, "not only while in transportation but also while on the premises of the owner, while stored, or while in the custody of others generally." *Id. See generally Fireman's Fund v. Structural Sys. Tech., Inc.*, 426 F.Supp.2d 1009, 1025 (D.Neb.2006) (wide variety of property damage coverages); *Waldan Gen. Contractors, Inc. v. Mich. Mut. Ins. Co.*, 227 Mich. App. 683, 577 N.W.2d 139, 140 (1998) (covers transportation risks and any "property that might be affected by movement") (citing Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 1.5(b)(2), at 20 (student ed.1988)). Inland marine insurance "includes many forms of insurance wholly lacking in marine features. While the chief characteristic is a relation to transportation, there are recognized categories which have no such relation." *Ins. Co. of N. Am. v. Comm'r of Ins.*, 334 Mass. 108, 134 N.E.2d 423, 424 (1956).[11]

¶ 15 " 'Builder['[]s risk' insurance is a ... form of property insurance that typically covers only projects under construction, renovation, or repair and insures against accidental losses, damages or destruction of property...." *Fireman's Fund*, 426 F.Supp.2d at 1025; *Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Auth.*, 867 So.2d 651, 659 n. 8 (La.2004); *S. Cal. Edison Co. v. Harbor Ins. Co.*, 83 Cal.App.3d 747, 148 Cal.Rptr. 106, 111 (1978). "Builder['[]s risk covers a project in construction, before it becomes insurable as a building, while its materials and components are being moved on-site, assembled, and put in place." *Village of Kiryas Joel Local Dev. Corp. v. Ins. Co. of N. Am.*, 996 F.2d 1390, 1392 (2d Cir.1993).[12] If a covered loss occurs, the insurer generally pays not only the cost of removing debris and salvaging mate-

rial, but also the cost of repairing the damaged property. *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So.2d 161, 165 (Fla. 2003).

¶ 16 "An emerging consensus in the insurance industry recognizes builder['[]s risk insurance as a form of inland marine insurance." *Holmes's Appleman on Insurance* § 1.12, at 63. "In the sense that builder['[]s risk insurance insures a construction project before the building being constructed becomes insurable as a building, and while its materials and components are being moved on-site, assembled, and put in place, the insured building site becomes a terminus for cargo, insurable as inland marine." *Id.* Thus, under this analytical approach, a builder's risk policy that covers both building materials and the partially constructed building prior to its completion is characterized as a form of inland marine insurance. *See Fireman's Fund*, 426 F.Supp.2d at 1027–28 (policy sold to contractor on inland marine policy form held to provide builder's risk coverage).

### E. Inland Marine Insurance as Defined by Arizona Law.

¶ 17 No Arizona statute specifically defines "inland marine insurance."[13] A regulation issued by the Arizona Department of Insurance, however, strongly supports the conclusion that the Liberty builder's risk policy constituted inland marine insurance within the meaning of Arizona law. The relevant provision is Arizona Administrative Code ("A.A.C.") regulation R20–6–602, titled "Nationwide Inland Marine Definition." In relevant part, R20–6–602 provides as follows:

 A. Applicability. This rule applies to risks and coverages which may be classified or identified as Marine, Inland Marine or Transportation insurance but shall not be construed to mean that the kinds of

---

11. The current concept of "inland marine" is very broad, encompassing a range of specific risks that is so wide that the term is quite difficult to apply. The expansion of original inland marine coverages to include special policies adapted to a wide variety of particular risks, many of which are in the form of "floaters," renders this classification so broad that it is impossible to define the term with exactness.

11 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 154:3, at 154–11 (3d ed.1998).

12. For further discussion of this case, see *infra* ¶¶ 34–35.

13. Arizona Revised Statutes § 20–255 (2002) defines "marine and transportation insurance." *See infra*, ¶¶ 31–33.

risks and coverages are solely Marine, Inland Marine or Transportation insurance in all instances.

. . . .

B. Marine and/or transportation policies may cover under the following conditions:

. . . .

6. Commercial Property Floater Risks covering property pertaining to a business, profession or occupation.

. . . .

i. Builder[']s Risks and/or Installation Risks covering interest of owner, seller or contractor, against loss or damage to machinery, equipment, building materials or supplies, being used with and during the course of installation, testing, building, renovating or repairing. Such policies may cover at points or places where work is being performed, while in transit and during temporary storage or deposit, of property designated for and awaiting specific installation, building, renovating or repairing.

i. Such coverage shall be limited to Builder[']s Risks or Installation Risks where Perils in addition to Fire and Extended Coverage are to be insured.

ii. If written for account of owner, the coverage shall cease upon completion and acceptance thereof; or if written for account of a seller or contractor the coverage shall terminate when the interest of the seller or contractor ceases.

¶ 18 In construing a rule promulgated by an administrative agency, we apply the principles of construction that we apply to statutes. *Marlar v. State*, 136 Ariz. 404, 410, 666 P.2d 504, 510 (App.1983); *see also Goodman v. Superior Court*, 136 Ariz. 201, 203, 665 P.2d 83, 85 (1983) (rules have "the same effect and force as a 'law' "). Therefore, "we follow fundamental principles of statutory construction, the cornerstone of which is the rule that the best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction." *Janson ex rel. Janson v. Christensen*, 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991); *see also Kent K. v. Bobby M.*, 210 Ariz. 279, 283, ¶ 14, 110 P.3d 1013, 1017 (2005).

¶ 19 Although the label an insurer chooses to place on a policy form is not always dispositive, we note at the outset that the Liberty policy represents itself to be a "property floater" policy such as that encompassed by subpart (B)(6) of R20–6–602, which classifies as "marine" insurance a policy that covers "Commercial Property Floater Risks covering property pertaining to a business, profession or occupation." [14] Within the category of "Commercial Property Floater Risks," subpart (B)(6)(i) of the regulation provides that marine insurance includes "Builder[']s Risks and/or Installation Risks covering interest of owner, seller or contractor, against loss or damage to . . . equipment, building materials or supplies, being used with and during the course of installation . . . [or] building." [15]

¶ 20 Although Weitz acknowledges the reference in subpart (B)(6)(i) to "builder[']s risk" coverage, it argues that R20–6–602 does not include insurance covering a partially constructed building. We disagree. Subpart (B)(6)(i)'s reference to coverage of "building materials . . . during the course of installation . . . [or] building" encompasses coverage of building materials during construction of a building, which to us means coverage of the partially constructed building

---

14. Arizona Revised Statutes § 20–252 (2002) defines "[p]ersonal property floater insurance" as "insurance upon personal effects against loss or damage from any cause." *See also Black's Law Dictionary* 805 (7th ed.1999) ("floater insurance" defined as "[a]n agreement to indemnify against a loss sustained to movable property, wherever its location within the territorial limit set by the policy").

15. The same provision encompasses risks against loss or damage during "testing." We note that although the Liberty policy stated that coverage would be suspended during any period of occupancy, it specifically provided that "[t]emporary use of the premises for 'testing' or other operations shall not be considered an occupancy within the meaning of [the policy]."

to which the building materials become affixed.[16]

¶ 21 More significantly, however, subpart (B)(6) of the regulation plainly encompasses coverage of a construction project such as this in which a contractor's insurable interest in the covered property—the construction project as a whole, including the partially constructed building—continues until the owner's acceptance of the project upon its completion. *See* A.A.C. R20–6–602(B)(6)(i)(ii) ("If written for account of owner, the [builder's risk] coverage shall cease upon completion and acceptance thereof; or if written for account of a seller or contractor the coverage shall terminate when the interest of the seller or contractor ceases."). The regulation's reference to coverage ceasing upon "completion" necessarily contemplates coverage continuing until construction of the building is complete. Likewise, an owner that has contracted to have a building constructed does not "accept" the various materials the contractor hauls to the site to build the project; the owner accepts the building itself, after construction is complete.

¶ 22 As Liberty argues, a builder's risk policy typically insures both building materials and the partially constructed building until the time that the building is completed and the owner accepts the building or the contractor's insurable interest in the project ceases. At that point, builder's risk coverage no longer applies, and the owner purchases traditional fire insurance coverage for the building. Liberty correctly argues that the builder's risk provision in the inland marine regulation corresponds with this logical framework in that under R20–6–602(B)(6)(i)(ii), a builder's risk inland marine policy remains in effect until the building is complete, the owner accepts the building or the contractor's insurable interest terminates. The policy Liberty sold to Weitz in this case follows this pattern. As noted, *see supra* ¶ 12, that policy expressly provided that coverage terminated both when the owner, Arizona State University, accepted the property, and when Weitz's interest in the property ceased.

¶ 23 Weitz's contrary reading of the regulation turns this reasoning on its head. Weitz argues that the regulation applies to coverage of risks to "building materials" but not those materials after they become attached to the partially constructed building, or the partially constructed building itself. But subpart (B)(6)(i)(ii) of the regulation makes plain that it encompasses insurance for a partially finished construction project (coverage terminates only "upon completion and acceptance" of the finished project), not simply the raw building materials stored at the construction site. *See Holmes's Appleman on Insurance* § 1.12, at 63 ("[B]uilder's risk insurance insures a construction project before the building being constructed becomes insurable as a building . . . .").

¶ 24 The history of the regulation also supports the conclusion that builder's risk policies are inland marine insurance under Arizona law. In relevant part, R20–6–602 is taken verbatim from a model regulation titled "Nationwide Inland Marine Definition" adopted in 1976 by the National Association of Insurance Commissioners ("NAIC"). *See* I NAIC, *1977 Proceedings of the NAIC* 666–71 (David A. Vaprin ed.1977); I NAIC, *1976 Proceedings of the NAIC* 611–18 (David A. Vaprin ed.1976) (full report reprinted therein).

¶ 25 Before 1977, the NAIC model regulation included within the definition of inland marine insurance the coverage of "installation risks," including building materials, but provided that to be classified as inland marine insurance, coverage must terminate "when the materials are installed and have become a physical part of the realty or when the seller's interest ceases, whichever first occurs." II NAIC, *1953 Proceedings of the NAIC, 84th Annual Meeting* 566–67 (1953). The 1977 model regulation replaced that provision with the language now found in subpart (B)(6)(i) of the Arizona regulation. That language, promulgated in Arizona in 1985, no longer required that coverage terminate

---

**16.** This interpretation is reinforced by language in subpart (B)(6)(i) of the regulation to the effect that inland marine coverage includes coverage

"at points or places where work is being performed."

upon installation in order to be classified as inland marine insurance; instead, to the contrary, it provided that such coverage must terminate later in time, specifically, "upon completion and acceptance" by the owner or "when the interest of the seller or contractor ceases." *See* A.A.C. R20–6–602(B)(6)(i)(ii).

¶ 26 In considering the 1977 change to the model regulation, the NAIC Committee on Interpretation of the Nationwide Marine Definition recommended that the 1953 definition "be expanded and updated in light of today's new kinds of industries, processes, commercial operations and insurance needs." I NAIC, *1977 Proceedings of the NAIC* 611 (David A. Vaprin ed.1977). Specifically with regard to the inland marine provisions at issue in this case, the Committee stated:

> For example, the installation floater would be extended to cover property in transit to the site of installation and until acceptance by the owner or termination of the contractor's interest, whichever occurs first, thus avoiding the necessity of the contractor obtaining more than one policy to cover his interest in materials during transit and until accepted by the owner.

*Id.*

¶ 27 In a summary of the regulation issued in connection with the promulgation of the Arizona regulation, the Arizona Department of Insurance explained that the regulation would "reflect changes currently occurring in the industry." Notice of Proposed Adoption of Rules re proposed amendment to A.C.C.R. R4–14–602 (Feb. 12, 1985) (attach.) (on file with Arizona Department of Insurance).[17] Significantly, the summary, which was submitted with the Notice of Proposed Adoption of Rules, stated that under the new regulation, "Course of Construction (COC) risks are permitted on Inland Marine forms as long as perils in addition to Fire and Extended Coverages are included." *Id.*

¶ 28 We find further support for our conclusion that the Liberty policy constituted inland marine insurance in a fundamental inconsistency between that policy (and a builder's risk inland marine policy as defined by Arizona law), on one hand, and the Arizona Standard Fire Policy, on the other. As noted above, R20–6–602 expressly requires that an inland marine builder's risk policy terminate when the owner of the building accepts it for occupancy. *See* A.A.C. R20–6–602(B)(6)(i)(ii). That provision reflects the pre-occupancy "course of construction" coverage that the Department of Insurance explained in its summary of the new regulation in 1985. Consistent with R20–6–602(B)(6)(i)(ii), the Liberty policy at issue here was written to terminate upon the owner's acceptance of the new dormitories Weitz had been hired to construct. By contrast, the Standard Fire Policy presumes that the building covered by a policy is occupied (indeed, it provides that absent policy language to the contrary, the insurer "shall not be liable for loss occurring" in an unoccupied building).[18]

¶ 29 The regulation promulgated in Arizona in 1985 also disposes of Weitz's argument that the Liberty policy should be subject to the Standard Fire Insurance Policy requirements simply because it provided some nature of fire coverage. As noted, subpart (B)(6)(i)(i) of R20–6–602 contemplates that a builder's risk policy may be classed as inland marine even though it includes fire coverage: "[s]uch coverage shall be limited to Builder[']s Risks or Installation Risks where Perils in addition to Fire and Extended Coverage are to be insured." Consistent with subpart (B)(6)(i)(i), the Lib-

---

17. The amended regulation subsequently was renumbered as R20–6–602.

18. The fundamental inconsistency between a builder's risk policy such as the Liberty policy and the Arizona Standard Fire Policy also is illustrated by two of the endorsements that Weitz asserts are void because they do not comply with the Standard Fire Policy. The endorsements expressly apply to construction activities that would not commonly be conducted in a building that was fully complete. One, titled "Fire Watch Warranty Endorsement," required that a "fire watch will be conducted during all welding operations or other hot processes." Another required a "daily inspection of the jobsite ... for the purpose of seeking out smoldering embers from welding or other hot processes, smoking by employees, or other hazards which pose a threat to the insured property."

erty policy indeed covered "perils" in addition to fire and extended coverage.[19]

¶ 30 Weitz argues that subpart (B)(4) of R20–6–602 compels the conclusion that the insurance afforded by the Liberty policy cannot be inland marine insurance because that subpart specifically excludes coverage of "buildings." But a fair reading of the entire subpart in context makes clear that it does not exclude the Liberty builder's risk policy from the scope of inland marine insurance, for purposes of Arizona law. In relevant part, subpart (B)(4) states that inland marine policies may cover "[b]ridges, tunnels and other instrumentalities of transportation and communication *excluding* buildings, their improvements and betterments, their furniture and furnishings, fixed contents and supplies held in storage." (Emphasis added.) In context, the subpart does not constitute a blanket exclusion of all coverage of buildings. Instead, its exclusion of "buildings" applies only to buildings in proximity to "bridges, tunnels and other instrumentalities of transportation and communication." A.A.C. R20–6–602(B)(4).

¶ 31 The broad scope of R20–6–602(B)(6) is consistent with A.R.S. § 20–255 (2002), which defines "marine and transportation insurance." *See generally* A.R.S. § 41–1001(17) (2004 & Supp.2006) (A rule is "an agency statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of an agency."). Section 20–255 sets out several categories of insurance that fall within the definition of "marine and transportation" insurance. Relevant here is subpart (2), which includes within the statutory definition of "marine and transportation insurance" the following:

> Insurance against any and all kinds of loss or damage to person or to property in connection with or appertaining to a marine, inland marine, transit or transportation insurance, including liability for loss of or damage to either, arising out of or in connection with the construction, repair, operation, maintenance or use of the subject matter of such insurance, but not in-

cluding life insurance or surety bonds nor insurance against loss by reason of bodily injury to the person arising out of the ownership, maintenance or use of automobiles.

A.R.S. § 20–255(2).

¶ 32 Weitz argues that because A.R.S. § 20–255 does not specify as inland marine insurance a policy that covers fire damage to a building under construction, the Liberty policy cannot be a "marine" policy under Arizona law. But the absence of a specific reference to "fire" coverage or to "building under construction" does not mean that the statute casts too narrowly to include the Liberty policy within the "marine" definition.

¶ 33 Although § 20–255(2) does not specifically refer to insurance covering damage from fire, it expressly encompasses, in connection with marine insurance, "[i]nsurance against *any and all kinds* of loss or damage." A.R.S. § 20–255(2) (emphasis added). Moreover, by including within the definition of "marine and transportation insurance" a policy covering "liability for loss of or damage to [property] arising out of or in connection with the construction ... of the subject matter of such insurance," section 20–255(2) plainly encompasses fire insurance for a construction project such as the unfinished dormitories that were the subject of the Liberty policy.

¶ 34 Weitz relies on *Village of Kiryas Joel Local Development Corp. v. Insurance Company of North America,* which concluded that a builder's risk policy was not an inland marine policy under New York law. 996 F.2d at 1394. The policy in that case was issued in connection with the construction of a medical facility that burned prior to completion of construction. Id. at 1391. The insurer denied coverage, asserting that it had canceled the policy before the fire. *Id.* At the time, New York law restricted insurers from canceling property damage policies, but that restriction did not apply to cancellations of inland marine policies. *Id.* at 1391–92.

¶ 35 The Second Circuit Court of Appeals' decision in fact supports Liberty's argument

---

19. Within its terms, the Liberty policy covers "risks of direct physical loss to covered proper-

ty," with only certain specified exceptions not relevant to this appeal.

on appeal in that it noted an "emerging consensus in the insurance industry that recognizes builder[']s risk as a form of inland marine insurance." Id. at 1394 (citing 1 Roderick McNamara, Robert A. Laurence & Glenn L. Wood, *Inland Marine Insurance* 233–56 (1987)). The court ultimately found that the particular policy at issue in that case was not an inland marine policy under New York law because it did not designate itself as such and because it failed to conform to New York authority that required that a builder's risk inland marine policy terminate upon completion or acceptance by the owner. *Id.* The Liberty policy at issue here was unlike the *Kiryas Joel* policy in key respects: It specifically referred to "inland marine" insurance, and it terminated upon the owner's acceptance of the completed dormitories. *Village of Kiryas Joel Local Development Corp.,* therefore, offers no support for Weitz's argument that the Liberty policy did not constitute inland marine insurance under Arizona law.

¶ 36 Based on the provisions of R20–6–602, A.R.S. § 20–255 and the language of the Liberty insurance policy, we conclude as a matter of law that the policy constituted inland marine insurance within the meaning of Arizona law.[20]

#### F. Severability of the Policy.

¶ 37 Weitz finally argues that terms within a policy insuring against different perils are severable; it urges us to segregate the portion of the Liberty policy insuring against fire loss and construe it to be "governed by the statutes relating to property insurance," including, presumably, the Standard Fire Policy requirements. To be sure, Arizona cases have held that under certain circumstances insurance policy provisions may be "divisible and severable." *Kearney*

*v. Mid–Century Ins. Co.,* 22 Ariz.App. 190, 192–93, 526 P.2d 169, 171–72 (1974) ("A policy of insurance, although purporting to be entire, which insures against various perils and risks, is divisible and severable.") (citing *Adams v. N. Ins. Co. of New York,* 16 Ariz. App. 337, 493 P.2d 504 (1972)).

¶ 38 We see no logical reason, however, to apply that doctrine to segregate the fire coverage provided by the Liberty policy from the other coverages the policy provided. We are guided here primarily by the breadth of the coverage that is construed to be inland marine coverage by A.R.S. § 20–255 and the corresponding regulation, A.A.C. R20–6–602. As noted above, section 20–255 provides that coverage of "any and all kinds of loss or damage" may be marine insurance. The wide scope of that language does not indicate that, when possible, one should sever one variety of coverage from another, for purposes of the statute. We recognize that R20–6–602(A) cautions that the regulation "shall not be construed to mean that the kinds of risks and coverages are solely Marine, Inland Marine or Transportation Insurance in all instances." But the regulation establishes no principle requiring us to separate the fire coverage in the Liberty policy from other builder's risk coverages afforded by the policy. Indeed, subpart (B)(6)(i)(i) of the regulation specifically refers to "Fire and Extended Coverage," from which we understand that when encompassed within a builder's risk policy, fire coverage is construed to constitute inland marine insurance. Finally, separating fire from the other coverages provided by Liberty policy would render meaningless A.R.S. § 20–1501, the purpose of which is (in part) to exempt inland marine coverages (including fire) from the require-

---

**20.** In its briefs, Liberty places much reliance on the Warfel affidavit, which it asserts it submitted to the superior court with its response to Weitz's motion for summary judgment and which, it asserts, "stands unrebutted." According to the record, however, Liberty did not submit the Warfel affidavit to the superior court until it moved for reconsideration of the trial court's grant of summary judgment against it. Consistent with the rules, Weitz did not respond to the Warfel affidavit because the superior court did not ask it

to do so. *See* Arizona Rule of Civil Procedure 7.1(e) (motions for reconsideration shall be submitted without response, unless court otherwise directs). In any event, we have not considered the affidavit because the question of whether the Liberty policy is an inland marine policy within the meaning of A.R.S. §§ 20–255 and –1501 is a question of law, not a question of fact to which the Warfel affidavit might otherwise be instructive.

ments of the Arizona Standard Fire Policy.[21]

## CONCLUSION

¶ 39 For the foregoing reasons, we hold as a matter of law that the builder's risk policy Liberty sold to Weitz constitutes inland marine insurance within the meaning of A.A.C. R20–6–602 and A.R.S. § 20–255. As a result, the policy is exempt under A.R.S. § 20–1501 from the requirements of the Arizona Standard Fire Policy, and the warranty endorsements that Liberty contends were breached are not void under A.R.S. § 20–1503.[22] We therefore reverse the superior court's grant of summary judgment in favor of Weitz. Because the record reflects additional disputes between the parties regarding coverage, we remand for further proceedings consistent with this opinion. We express no opinion on the additional coverage disputes.

CONCURRING: ANN A. SCOTT TIMMER, Presiding Judge and PATRICIA K. NORRIS, Judge.

21. If Weitz's severability argument is that the fire coverage within the Liberty policy should be otherwise severed into two parts—coverage of the building materials and the partially constructed building on the one hand, and coverage of the completed building on the other—the argument fails because, by its terms, the policy terminates upon completion of the dormitories and their acceptance by the owner. In that respect, as noted, the Liberty policy complies with the limited coverage term (only pre-acceptance) dictated for inland marine policies by R20–6–602(B)(6)(i)(ii). If Weitz's argument is that fire coverage provided by the policy should be segregated into coverage of the building materials, on the one hand, and coverage of the partially constructed building, on the other, that distinction flies in the face of the same provision, which requires coverage of the project through its completion and acceptance by the owner. A.A.C. R20–6–602(B)(6)(i)(ii).

22. In light of our disposition, we need not address the parties' remaining arguments.