[Civ. No. 50771. Second Dist., Div. Five. Aug. 11, 1978.]

SOUTHERN CALIFORNIA EDISON COMPANY et al.,
Plaintiffs and Appellants, v.
HARBOR INSURANCE COMPANY et al.,
Defendants and Respondents.

**COUNSEL**

Tucker & Coddington, William G. Tucker, F. Leonard Sisk, Patrick L. Johnston and Richard A. Vachon for Plaintiffs and Appellants.

Cummins, White & Breidenbach, James O. White, Howard L. Halm, Bogert, Ehrmann & Halpern, David C. Bogert and Frances Ehrmann for Defendants and Respondents.

## OPINION

**STEPHENS, Acting P. J.**—Following a nonjury trial, judgment was entered declaring that insureds under two insurance policies were not entitled to reimbursement for expenses claimed pursuant to "sue and labor" clauses contained in each policy. Insureds appeal from the judgment.

A consortium consisting of six utility corporations and a political subdivision of the State of Arizona, headed by Southern California Edison Company,[1] joined together to construct a coal-fired steam generating plant located near Farmington, New Mexico. The plant comprised units Nos. 4 and 5 of a larger complex called the Four Corners Project. A number of insurance companies, each assuming a specific percentage of risk, combined to issue to Edison two insurance policies.[2] The policies provided successive periods of coverage. The first, a builder's risk policy, provided coverage during the course of construction of the units. The builder's risk policy became effective on April 4, 1966, and continued in effect (with an exception not relevant here) until the commercial operating dates of units 4 and 5, July 1, 1969, and July 1, 1970, respectively. Unless specifically excluded, the builder's risk policy covered "all property and work performed, pertaining to designated projects, the construction, installation or repair of which the named assured is performing or will be performing, owned by the named assured or an additional assured or held by any of them in trust or in joint account with others, . . . [¶] . . . against loss and/or damage from any cause whatsoever . . . ." As pertinent, among the exclusions specified, was: "(G) Cost of making good faulty workmanship, construction or design; but this exclusion shall not apply to damage resulting from such faulty workmenship, [*sic*] construction or design."

The second policy, designated by the parties as the all property policy was at risk from the commercial operating date of each unit and provided coverage for "[a]ll real and personal property of every description . . . [¶] . . . against all risks of direct physical loss or damage from any cause, howsoever and wheresoever occurring . . . ." The all property policy remained effective until November 1, 1970. Among the exclusions

---

[1]For purposes of convenience the consortium shall be referred to as Edison.

[2]The majority of the insurance companies subscribed to both policies, five of them subscribed only to the builder's risk policy and eight of them subscribed only to the all property policy.

specified in said policy were: "(O) Property while in the course of construction or installation to the extent that such properties are otherwise insured. . . . [¶] (X) Cost of excavations, grading, filling, dredging, sidewalks, fences, paving and/or blacktopping, and foundations and footings. . . . [¶] (Z) Loss or damage caused by or resulting from, contributed to or aggravated by any of the following: . . . 3. Water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows, or any other openings in such sidewalks, driveways, foundations, walls or floors; . . ."

Each policy contained essentially similar sue and labor clauses, which required that the insured, without prejudice to their claims under the basic insurance policy, "sue, labor and travel for, in and about the defense, safeguard and recovery" of property insured. Under the sue and labor clauses, the insurers were made expressly liable for expenses so incurred.

The contract for designing and building the units was awarded to Bechtel Corporation. Construction of the project was commenced in 1966. Prior to the commercial operating dates of units 4 and 5, the foundations underlying the units began to settle differentially. In certain areas, the settling amounted to more than one and one-half inches.

Commencing in 1969, mudjacking operations were instituted by Edison to lift the foundations of units 4 and 5. In mudjacking, a mixture called grout, consisting of sand, silt, clay and cement, is compressed into the rock formations underlying the formations; the grout expands and raises the foundations. By this method, the foundations were successfully raised near to their initial and intended elevation.

Edison filed a proof of loss form in the amount of $1,855,000, representing costs expended by it as of the date of the form and the present worth of estimated future costs. The claimed losses were for costs of mudjacking and expenses associated with mudjacking (surveying, drilling, monitoring, etc.). The insurers under both policies denied coverage.

Upon the denial of coverage, Edison brought the present action against the builder's risk and all property insurers for a declaration that the costs

of mudjacking claimed were included within the coverage of the respective policies.[3]

After conclusion of trial, the court found that the costs of mudjacking claimed by Edison were not covered in either policy. The court held that the costs were excluded from coverage under the builder's risk policy pursuant to provision (G). With regard to the all property policy, the court concluded that the events or occurrences causing the claimed costs happened prior to the time when the policy was at risk. Moreover, the court concluded that, in any event, coverage of costs was excluded under the all property policy by provisions (O), (X), and (Z)(3).

In reaching its conclusions, the court made the following pertinent findings of fact, which, with two exceptions noted below, are not challenged by Edison on appeal. (Renumbered for convenience.)

1. "The final basic manuscript form of [the builder's risk policy] contained eight pages and was not prepared by any of the insurance company defendants."

2. "Prior to the Commercial Operating Dates of Units 4 and 5, while the [builder's risk policy] was in effect, the foundations underlying Units 4 and 5 began to settle differentially, causing loss and damage to plaintiffs. Said differential settlement of foundations was the efficient cause of all loss and damage suffered by plaintiffs . . . ."

3. "The foundations underlying Units 4 and 5 were spread footings and turbine mats, bottomed at shallow elevations in a strata of weathered sandstone containing lenses of gypsum and other salts, and belled caissons bottomed in and on a deep strata of hard, unweathered sandstone or bedrock.

4. "That part of Units 4 and 5 supported on the belled caissons experienced no significant settlement whereas that part of Units 4 and 5 supported on the spread footings and turbine mats settled more than one and one-half inches in certain areas.

---

[3]Noninsurance defendants, including Bechtel, were dismissed without prejudice. The matter proceeded to trial only on the issue of insurance coverage.

5. "Overall design and construction of the Four Corners Project was based in part on an expected differential settlement of no more than one-half inch.

6. "The cause of the settlement of that part of the foundations resting on spread footings and turbine mats was the dissolution and leaching of the gypsum lenses in the upper strata of weathered sandstone, and said dissolution and leaching resulted from the rise in the underground water table and the increase in temperature of the underground water as a function of the construction and operation of Units 4 and 5.

7. "The increase in elevation of the water table and the rise in temperature of the subsurface water beneath Units 4 and 5 directly resulted from faulty design and construction of said Units 4 and 5 which included unlined, unsealed water intake and discharge canals connecting said units to a nearby cooling pond sometimes referred to as Lake Morgan. The fact that the canals were unlined permitted water to escape therefrom into the exposed strata, from whence it flowed, migrated and percolated through the permeable weathered sandstone underlying Units 4 and 5, dissolving and leaching soluble gypsum lenses deposited interstitially throughout the strata. The leaching of the lenses created voids which were collapsed and consolidated by the weight of the structures being supported, resulting in excessive settlement of the foundations bottomed in the upper strata.

8. "The differential settlement resulted from faulty foundation design which failed to take into account the known presence of gypsum lenses in the permeable weathered sandstone upper strata.

9. "The differential settlement resulted from faulty foundation design which bottomed part of the foundations in shallow strata subject to further consolidation and compaction and bottomed the other part of the foundations in deep strata subject to little or no further consolidation and compaction.

10. "All of the loss or damage alleged by plaintiffs was caused by, did result from, contributed to, or was aggravated by water below the surface of the ground.

11. "The property damaged or to which loss occurred was in the course of construction or installation, and within the meaning of the All Property Coverage, was 'otherwise insured' at the time of the damage or loss.

12. "All of the damage or loss suffered by plaintiffs was the cost of filling, foundations and footings.

13. "Prior to commencement of construction, plaintiff Arizona Public Service Company and plaintiffs' agent, general contractor Bechtel Corporation, had in their possession an extensive geologic analysis of the strata located in close proximity to and directly beneath the site of the proposed Units 4 and 5, which analysis referred to the presence of gypsum lenses and the possibility of dissolution and leaching, and recommended that foundations be placed on deep-set caissons bottomed on the strata of hard sandstone.

14. "Prior to commencement of construction of Units 4 and 5, plaintiffs knew that the adjacent Units 1, 2 and 3 were built on foundations of caissons bottomed on the strata of hard sandstone, and said Units 1, 2 and 3 had experienced no significant differential settlement.

15. "Prior to commencement of construction of Units 4 and 5, plaintiffs' agent, general contractor Bechtel Corporation, knew that the operation of the immediately adjacent Units 1, 2 and 3 had caused a rise in elevation of the ground water level.

16. "In 1969, remedial mudjacking or pressure grouting under certain of the shallow foundations in the boiler sections of Units 4 and 5 returned said foundations to datum or near datum elevation, and no other significant corrective action was undertaken during the policy periods of the [builder's risk] or All Property policies.

17. "After the 1969 mudjacking, gradual differential settlement occurred over a period of years, requiring additional mudjacking in 1971 in the coal silo sections of Units 4 and 5, to return affected foundations to datum elevation. In 1975 certain crane rail extension foundations were raised and shimmed to correct misalignment resulting from the differential settlement. However, none of the losses, costs or damages associated with said subsequent differential settlement is covered by either the [builder's risk] or All Property policies.

18. "The only loss and/or damage suffered by plaintiffs was in making good the faulty design."

Edison's contentions on appeal concerning each policy will be considered separately.

*Builder's Risk*

It is clear, and Edison impliedly concedes, that the mudjacking costs are not compensable under the basic insurance policy. Its claimed costs are excluded under the first clause of provision (G) as a "cost of making good faulty workmanship, construction or design." It was found that the differential settlement resulted from faulty foundation design. The mudjacking, in raising the foundation to datum levels, compensated for and corrected the foundation design defects. As such, the mudjacking costs were excluded under the first clause of (G).

However, Edison argues, as its sole contention concerning the Builder's Risk policy that the mudjacking costs are recoverable under the sue and labor clause contained in the policy since the mudjacking costs were incurred by it in mitigating and preventing loss for which the insurers would be liable. In reaching that conclusion, Edison makes a number of assumptions under the policy which shall be analyzed below.

1. *Damage to the superstructure and recovery for such under the basic insurance policy.*

In arguing that the sue and labor clause provides coverage for its mudjacking costs, Edison asserts that findings of fact Nos. 12 and 18 are contrary to the evidence. In those findings the court stated that "12. [a]ll of the damage or loss suffered by plaintiffs was the cost of filling, foundation and footings" and that "18. [t]he only loss and/or damage suffered by plaintiffs was in making good the faulty design." Edison maintains that there was evidence of additional damage resulting from the differential settlement. In its brief, Edison states: "[T]here was evidence showing real physical damage to the steel H beams of the superstructure and the distinct possibility of destruction of the entire superstructure had not immediate action been taken." Citing, among other cases, *Hauenstein* v. *Saint Paul-Mercury Indem. Co.* (1954) 242 Minn. 354 [65 N.W.2d 122], *Geddes & Smith, Inc.* v. *St. Paul Mercury*

*Indemnity Co.* (1959) 51 Cal.2d 558 [334 P.2d 881], and *Owens Pacific Marine, Inc.* v. *Insurance Co. of North America* (1970) 12 Cal.App.3d 661 [90 Cal.Rptr. 661], Edison argues that the damage and the threatened damage to the superstructure was and would have been an insurable loss under an exception to the exclusion contained in the second clause of provision (G), which reads: "but this exclusion shall not apply to damage resulting from such faulty workmanship, construction or design."

The cases cited by Edison deal with the interpretation of exclusions contained in a standard contractor's *liability* insurance policy.[4] With some modifications, each case contained an exclusion to the effect that "This policy does not apply to injury to or destruction of . . . [1] any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured, or [2] work completed by or for the named insured, out of which the accident arises." In each case, the exclusions were interposed against claims made by contractors or purchasers of products from the contractor for claims of indemnification. ■ The rule emerging from the cases is that the insurer, while not liable for repair or replacement of the contractor's defective work or product, is nonetheless liable for damages to other property caused by the defects. (*Owens Pacific Marine, Inc.* v. *Insurance Co. of North America, supra,* 12 Cal.App.3d 661, 666-668.) Where there is no showing made of damage aside from the defective work or product, no recovery has been permitted. Edison, in reliance on these authorities, contends that the damage (and threatened damage) to the superstructure was separate and distinct from the defects in the foundation, and that damage to the superstructure as "other property" was recoverable under the policy. On the other hand, the insurers maintain that the foundation and the superstructure are inseparable for these purposes and, as treated as a whole, damage to the superstructure did not fall into the exception to the exclusion.

■ There is a fundamental difference between liability insurance indemnifying a contractor to third parties and builder's risk insurance. "[Liability insurance], unlike malpractice insurance, [is] not intended to indemnify the contractor (and through him the owner) for direct damages resulting because the contractor furnished defective materials or workmanship." (*Raferio* v. *American Employers' Ins. Co.* (1970) 5 Cal.App.3d 799, 808 [85 Cal.Rptr. 701].) In the instant case, the insurers, in plain and

---

[4]Both sides acknowledge that there is no prior law construing the language contained in provision (G).

unambiguous language, assumed exactly that responsibility: to insure directly against "damage resulting from such faulty workmanship, construction or design." Damage to the superstructure was recoverable under the policy.[5] This interpretation comports with the purpose of builder's risk insurance, which is to compensate for loss due to physical damage or destruction caused to the construction project itself. (12 Cal. Real Estate Law and Practice § 422.10[3].)

### 2. *Sue and Labor Clause*

As an insurable loss under the policy, Edison argues that it was required to take steps to mitigate and prevent damage to the superstructure. Edison claims that the mudjacking costs were so incurred and that under the sue and labor clause of the policy, it was entitled to reimbursement for such expenses. ■ Although we have agreed that damage to the superstructure would have been an insurable loss, we hold that the sue and labor clause, when read in conjunction with the entire policy, does not entitle Edison to reimbursement of the mudjacking costs. The costs, excluded under the terms of provision (G), are not compensable.

A sue and labor clause makes express the implied correlative duties between insured and insurer regarding losses compensable under an insurance policy. (*Young's Market Co.* v. *American Home Assur. Co.* (1971) 4 Cal.3d 309, 313 [93 Cal.Rptr. 449, 481 P.2d 817]; see generally Annots., 33 A.L.R.3d 1262, 86 A.L.R.2d 1247.) Under penalty of possible forfeiture of policy rights, the insured has the duty of preventing a threatened insurable loss and mitigating such loss when it does occur. (*White Star S. S. Co.* v. *North British & Merc. Ins. Co.* (E.D.Mich. 1943) 48 F.Supp. 808, 812-813; *Reliance Insurance Company* v. *The Escapade* (5th Cir. 1960) 280 F.2d 482, 488.) An insured who avoids or minimizes insurable loss acts for the benefit of the insurer. It is the benefit conferred which creates the duty on the part of the insurer to reimburse the insured for prevention and mitigation expenses. (*Leebov* v. *United States Fidelity and Guaranty Co.* (1960) 401 Pa. 477 [165 A.2d 82, 84]; *Harper* v. *Pelican Trucking Company* (La.App. 1965) 176 So.2d 767, 773; Note, *Allocation of the Costs of Preventing an Insured Loss,* (1971) 71 Colum.L.Rev. 1309, 1315-1322.)

---

[5]However, the record supports the conclusion that Edison failed at trial to establish monetary damage relating to the superstructure. Further, it is noted that Edison's proof of loss form did not contain a claim for damage to the superstructure.

Although the duty of reimbursement is said to be separate and supplementary to the basic insurance policy,[6] a sue and labor clause does not extend or create coverage; the recovery under a sue and labor clause is tied irrevocably to the obligations undertaken by the insurer in the basic insurance policy. (*Young's Market Co.* v. *American Home Assur., supra,* 4 Cal.3d 309, 314-315; *Continental Food Products, Inc.* v. *Ins. Co., Etc.* (5th Cir. 1977) 544 F.2d 834, 837; *Reliance Insurance Company* v. *The Escapade, supra,* 280 F.2d 482, 489.)

*Young's Market Co.* v. *American Home Assur. Co., supra,* illustrates the dependence of the sue and labor clause upon the terms of the basic insurance policy. In *Young's,* the Supreme Court denied the insured's claim, under a sue and labor clause, for legal expenses incurred in successfully defending a confiscation action by Texas officials. The court concluded that "[b]ecause confiscation was an excluded peril under the policy, and any loss sustained as a result of that peril would not have been recoverable, plaintiff's [insured's] efforts to prevent the loss—whether successful or unsuccessful—were undertaken for its own benefit and were not subject to reimbursement under the 'sue and labor' clause. To maintain the contrary is to maintain that an insured may recover under a 'sue and labor' clause for expenses incurred by it to prevent a loss for which the insurer would not have been liable had it occurred." (*Id.,* at p. 316, fn. 10.)

Thus, in *Young's* there was no duty of reimbursement because the loss, if it had occurred, would not have been covered under the basic insurance policy. In the instant case, a somewhat different situation is posed. Here, damage to the superstructure, if it had occurred, would have been an insurable loss. Notwithstanding, the means used by Edison to prevent or mitigate such damages were excluded from recovery under the policy. Edison has not cited, and our research has not disclosed, authority for the proposition that expenses excluded under the basic insurance policy are nonetheless recoverable under the sue and labor clause. The dependence of the sue and labor clause on the underlying insurance policy would suggest that Edison's claim should be rejected; the

[6] Appleman on Insurance (1972 ed.), section 3794, pages 160, 161, footnote 28.95, explains the limited independence of the sue and labor clause: "Sue and labor clause is separate insurance only in the sense that it provides for reimbursement to assured in addition to amounts payable under dollars limits of named perils coverage." (Citing *Reliance Insurance Company* v. *The Escapade, supra.*)

established rules for the construction of insurance policies dictate that result.

█ It is a well settled rule of construction for insurance policies that "a specific provision relating to a particular subject will govern in respect to that subject, as against a general provision even though the latter, standing alone, would be broad enough to include the subject to which the more specific provision relates." (*General Ins. Co.* v. *Truck Ins. Exch.* (1966) 242 Cal.App.2d 419, 426 [51 Cal.Rptr. 462].) Provision (G) excluding recovery for making good design defects stands as a specific provision taking precedence over the general clause contained in the sue and labor clause permitting reimbursement.

█ Further, it is also an established rule of construction that an insurance policy must be construed to effectuate the intentions of the parties. A construction which would defeat the expressed intentions of the parties must be rejected. "[W]here the terms of the policy are plain and explicit, the court will indulge in no forced construction so as to cast a liability upon the insurance company which it has not assumed [citations]." (*New York Life Ins. Co.* v. *Hollender* (1951) 38 Cal.2d 73, 81 [237 P.2d 510].) This rule has added weight where, as here, the insurance policy is not drafted by the insurer. (*Young's Market Co.* v. *American Home Assur. Co., supra,* 4 Cal.3d 309, 316.) In the instant case, in plain and explicit language, the insurers refused to assume liability for making good defects in design. Such intent must be respected, and not circumvented.

█ The duty of an insured to prevent and mitigate insurable loss and the obligation of the insurer to reimburse for expenses so incurred are separate questions. The fulfillment of the duty to mitigate does not necessarily give rise to the obligation of reimbursement; only mitigation expenses which are for the primary benefit of the insurer are recoverable under a sue and labor clause. (*Reliance Insurance Company* v. *The Escapade, supra,* 280 F.2d 482, 488.)

Edison was under a duty to prevent and mitigate insurable loss. The effect of the sue and labor clause in that regard was only to make express that implied duty. Edison was required to take all reasonable and necessary steps to prevent or mitigate damage to the superstructure. However, it must be remembered that the only reason the superstructure was threatened was because of defects in the design of the underlying

foundations. Only by correcting the design defects was Edison able to prevent or mitigate loss to the superstructure. While loss to the superstructure was compensable under the policy, the correction of design defects was not. Mudjacking may have prevented or mitigated loss to the superstructure, but at the same time it was the means by which Edison corrected the design defects. Under this loss allocation contained in the policy, it must be said that the costs of mudjacking were not primarily for the benefit of the insurers. The benefit inuring to the insurers was only incidental. (*Seaboard Shipping Corp.* v. *Jocharanne Tugboat Corp.* (2d Cir. 1972) 461 F.2d 500, 504-505.) The insured's duty of reimbursement, accordingly, never matured.

*All Property Policy*

With respect to the all property policy, Edison essentially makes the same argument for recovery of the mudjacking costs as it made under the builder's risk policy. Edison argues that, notwithstanding the conclusions contained in the basic insurance policy, the costs of mudjacking are recoverable under the sue and labor clause.

■ Each of the provisions (O), (X) and (Z)(3) (text *ante*) were found by the court to independently exclude Edison's claim for reimbursement. More fundamentally though, the court concluded that the all property policy was never at risk for the costs claimed by Edison. This conclusion was based on the facts that the all property policy was to take effect on the commercial operating date for each unit and that prior to these dates the cause of and the damage by the differential settling were both apparent. Edison, on appeal, does not challenge the court's findings or conclusion regarding when the policy became at risk. Accordingly, judgment in favor of the all property insurers is affirmed without discussing Edison's contentions.

DISPOSITION

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied August 29, 1978, and appellants' petition for a hearing by the Supreme Court was denied October 4, 1978.