Filed 10/26/15  (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ARTHUR GREBOW et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>MERCURY INSURANCE COMPANY,<br><br>      Defendant and Respondent. | B261172<br><br>(Los Angeles County<br>Super. Ct. No. LC101066)<br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 21, 2015 be modified as follows:

On page 10 in the second full paragraph delete the last sentence beginning with "accordingly" and add the following sentence:  **Accordingly, the policy did not cover the existing conditions of the Grebows's residence.**

On page 10 in the heading 2 change "*Prevision*" to **Prevention**.

On page 10, immediately after heading 2. add the following paragraph:

**It is arguable—although Mercury did not specifically make the argument— that had there been a collapse, the exclusion would have precluded coverage, and therefore the insurer, on that basis, would have no duty to reimburse the Grebows for their costs for any mitigation or preventative work.  But, as we discuss, if the**

**exclusion did not apply, the insurer had no duty to reimburse the Grebows for such costs.**

There is no change in judgment.  The petition for rehearing is denied.

---

MOSK, J.                              TURNER, P. J.                              KRIEGLER, J.

Filed 10/21/15  (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ARTHUR GREBOW et al., | B261172 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. LC101066) |
| v. | |
| MERCURY INSURANCE COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Josh Fredericks and Russell Kussman, Judges.  Affirmed.

Grebow & Rubin, Arthur Grebow for Plaintiffs and Appellants.

Hager & Dowling, John V. Hager, Christine W. Chambers for Defendant and Respondent.

# INTRODUCTION

Plaintiffs and appellants Arthur and Helen Grebow (the Grebows) appeal from a summary judgment in favor of defendant and respondent Mercury Insurance Company (Mercury) for causes of action for breach of contract and tortious breach of insurance contract. The Grebows experienced significant damage to their rear deck and supporting structure of their residence. Their general contractor and structural engineer advised them that the rear of the residence was in the process of falling to the ground and strongly advised them not to enter the second story of the house until they repaired the damage. The Grebows spent over $91,000 on such repairs. They then made a claim for reimbursement of that amount against Mercury, their homeowner's insurer, because at least a portion of the house had collapsed and because the expenditure was to avoid imminent insurable damage and to mitigate damages. Mercury contended that the Grebows' claim under their homeowner's insurance policy was not covered because the damage to their property did not constitute a "collapse" as defined by the policy. The definition of a collapse is a "sudden and complete breaking down or falling in or crumbling into pieces or into a heap of rubble or into a flattened mess." Mercury also argued that it had no obligation to reimburse for expenditures to avoid an insurable loss and there was no mitigation as that term is used in the policy.

The trial court granted a motion for summary judgment in favor of Mercury and denied the Grebows's motion for summary adjudication.[1] The Grebows filed a timely appeal. We hold that Mercury is not liable for the reimbursement costs because there was not a collapse as defined in the policy, the duty to mitigate arises only after a loss from a collapse, and Mercury had no duty, express or implied, to reimburse the Grebows for costs to prevent imminent insurable damage.

---

[1] We augment the record with the signed order denying the Grebows' motion for summary adjudication and granting Mercury's motion for summary judgment.

# STATEMENT OF THE FACTS[2]

The Grebows owned a residence located in Tarzana, California (the property). In February 2002, they purchased a Superior Property Homeowners Policy (the policy) from Mercury that provided coverage for the property. The policy limits were $1,466,000, with a $2,500 deductible.

In May 2013, the Grebows asked a general contractor to inspect the rear deck of the house because of recurring watermarks. The contractor discovered severe decay in the steel beams, which, with steel poles, supported the second floor of the house. He reported that the supporting beams and poles could not support the upper portion of the house, and that a large portion of the house would fall.

A structural engineer inspected the property and agreed with the general contractor's assessment. The engineer believed the failure of the poles and beams was caused by decay and corrosion, which were concealed by the deck floor and patio ceiling. Because of the corrosion, the upper portion of the house was in danger of falling and the Grebows were advised not to enter the top portion of their house until repair work was done. On May 17, 2013, the Grebows authorized the purchase of material for shoring and had it installed the next day. On May 28, 2013, the Grebows entered into a construction contract. On June 19, 2014, they orally notified Mercury of their claim for reimbursement of their repair expenses, and on June 20, 2013, sent a written claim for the reimbursement. Mercury responded that it would investigate, and on October 22, 2013, it denied the claim. The Grebows spent $91,000 to have the home remediated.

---

**2**      The facts are stated in accordance with the standard of review of summary judgment motions.

The relevant policy provisions are as follows:

"SECTION I—PERILS ISSUED AGAINST AND EXCLUDED PROPERTY

We insure for direct physical loss to property . . . .

"SECTION I—EXCLUSIONS

We do not insure, under any coverage, for any loss which would not have occurred in the absence of one or more of the following excluded events: We do not insure for such loss regardless of (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss . . . .

[¶] . . . [¶]

"4.    Neglect, meaning our failure to use all reasonable means to save and preserve property at and after the time of the loss.

[¶] . . . [¶]

"13.    Corrosion or Electrolysis. . . .

[¶] . . . [¶]

"17.    Loss caused by:

"a.    wear and tear, marring, scratching, deterioration;

"b.    inherent vice, latent defect, mechanical breakdown;

"c.    rust . . . ."

"SECTION I—OTHER COVERAGES

[¶] . . . [¶]

"7.    Collapse. We insure for direct physical loss to covered property caused by collapse of a building or any part of a building caused only by one or more of the following perils:

"a.    Perils Insured Against under Coverage C [Personal Property];

"b.    hidden decay;

4

"c.     hidden insect or vermin damage;

"d.     weight of contents, equipment, animals or people;

"e.     weight of ice, snow, sleet or rain which collects on a roof; or

"f.     use of defective material or methods in constructions, remodeling, or renovation if the collapse occurs during the course of the constructions, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, tennis court, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

Collapse means sudden and complete breaking down or falling in or crumbling into pieces or into a heap of rubble or into a flattened mass.  Collapse does not include settling, cracking, shrinking, bulging, expansion, sagging or bowing, nor a substantial impairment of the structural integrity of a structure or building, nor a condition of imminent danger of collapse of a structure or building."

The policy imposed the following relevant conditions:

"SECTION I—CONDITIONS

[¶] . . . [¶]

"2.     Your Duties After Loss.  In case of a loss to which this insurance may apply, you must perform the following duties:

"a.     give prompt notice to us or our representative;

[¶] . . . [¶]

"c.     protect the property from further damage;

"d.     prepare an inventory of the loss to the building and damaged personal property showing the quantity, description and amount of loss.  Attach all bills, receipts and related documents that jury the figures in the inventory. . . ."

In November 2013, the Grebows filed an action against Mercury. They alleged causes of action for breach of contract and tortious breach of insurance contract. The Grebows filed a motion for summary adjudication on the coverage issue. Mercury filed a motion for summary judgment on the ground that as a matter of law there was no coverage for the Grebows's claim and thus it had no obligation to reimburse the Grebows for the Grebows's expenses. The trial court denied the Grebows's motion for summary adjudication and granted Mercury's summary judgment motion. There is no indication that evidentiary objections were ruled upon, and no party refers to evidentiary objections as being an issue on appeal. The trial court denied the Grebows's motion for new trial. The Grebows filed a timely notice of appeal, appealing the denial of their motion for summary adjudication, the granting of Mercury's summary judgment, and the denial of the Grebows's motion for new trial.

**DISCUSSION**

### A. Standard of Review, Rules of Interpretation, and Choice of Law

Our review of the trial court's ruling on the summary judgment motion is governed by well established principles. "'"A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); see also *id.,* § 437c, subd. (f) [summary adjudication of issues].) The moving party bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish,'" the elements of his or her cause of action. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 [30 Cal.Rptr.3d 797, 115 P.3d 77].)' (*Wilson v. 21st Century Ins. Co*. (2007) 42 Cal.4th 713, 720 [68 Cal.Rptr.3d 746, 171 P.3d 1082].) We review the trial court's decision de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party. (*Yanowitz v. L'Oreal USA, Inc*. (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123].)" (*State of California v. Allstate Ins. Co*. (2009) 45

6

Cal.4th 1008, 1017-1018.) Both parties had sought a determination as a matter of law on the issue of coverage. A denial of a motion for new trial after a summary judgment is reviewed de novo. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1176.) The policy provides for the application of California law to any dispute.

The California Supreme Court has established the following rules of interpretation: "Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. [Citation.] 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation (*id.,* at § 1638.)"'''' (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647-648 (*MacKinnon*).) Although "'''insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citation.]'" (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1074 (*Rosen*).) "'If possible, we infer th[e] intent solely from the written provisions of the insurance policy. [Citation.] If the policy language "is clear and explicit, it governs." [Citation.]' [Citation.]" (*Id.* at pp. 1074-1075.)

A provision in an insurance policy is deemed ambiguous when it is capable of at least two reasonable constructions. (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 415 (*Ace*); *MacKinnon, supra,* 31 Cal.4th at p. 648.) "'But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.' [Citation.]" (*MacKinnon, supra,* 31 Cal.4th at p. 648.) "Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19.)

7

Any ambiguity in an insurance policy is construed against the insurer in order to protect the insured's reasonable expectation of coverage. (*Ace, supra,* 37 Cal.4th at p. 415.)

Coverage of an insurance policy should be interpreted broadly and the exclusions narrowly to afford the greatest protection. (*MacKinnon, supra,* 31 Cal.4th at p. 648.) To prevail, the insurer must establish that its interpretation of the policy is the only reasonable one. (*Palp, Inc. v. Williamsburg National Ins. Co.* (2011) 200 Cal.App.4th 282, 290; see *MacKinnon, supra,* 31 Cal.4th at p. 648.)

**B. Analysis**

*1. Coverage for a Collapse*

The policy insures "for direct physical loss to covered property caused by collapse of a building or any part of a building caused only by one or more of the following perils: [¶] . . . [¶] b. hidden decay; . . ." "Collapse" is defined as "sudden and complete breaking down or falling in or crumbling into pieces or into a heap of rubble or into a flattened mass." The policy adds that "collapse" does not include "settling, cracking shrinking, bulging, expansion, sagging or bowing, nor a substantial impairment of the structural integrity of a structure or building, nor a condition of imminent danger of collapse of a structure or building."

The Grebows assert that the deck supporting the rear portion of the residence is a part of the building, that there was a collapse of that deck as that term is used in the policy because certain elements of the structure had become detached, and the collapse was due to hidden decay. Thus, the Grebows claim the insurance policy applied. Mercury contends that the clear language of the insurance policy is inconsistent with the Grebows's claims.

There is a split of authorities over the scope of collapse coverage when the policies leave the term "collapse" undefined. "Insurance companies reacted by defining 'collapse' and elaborating the provisions in an attempt to make the scope of coverage clearer. This effort has met with limited success, as courts continue to grapple with

8

disputes regarding the nature and scope of coverage. Consequently, the split in authority continues. One line of case law holds that 'collapse' requires a complete falling down or flattening to rubble before the loss becomes insured. The other lines of cases (which has been termed the 'modern' and 'majority' view) holds that the building need not entirely or even partially fall down in order for damage to rise to the level of a collapse. Rather, the property is deemed to have collapsed if the damage materially impairs the basic structure or substantial integrity of the building." (5 New Appleman on Insurance Law (Library ed. 2015) § 45.06[1], pp. 45-34 to 45-35, fns. omitted (New Appleman); see 10A Couch on Insurance (3d ed. 2005) § 148:54, pp. 148-93 to 148-96.)

As here, insurance companies have inserted "ever more explicit language in attempts to narrow the scope of [collapse] coverage." (New Appleman, *supra,* § 45.06[2][b] at p. 45-41.) "For the most part, courts have found such provisions to be unambiguous and enforced them to exclude damage to a building unless and until some part of the building has actually fallen down or been reduced to rubble." (*Id.* at p. 45-41.)

The policy includes clauses such as "sudden and complete breaking down or falling in or crumbling into pieces or into a heap of rubble or into a flattened mass" and excluding "substantial impairment of the structure or building" and "a condition of imminent danger of collapse of a structure or building." (See 5 New Appleman, *supra,* at § 45.06[2][b] at p. 45-41 for comparable language.) This language renders the collapse clause unambiguous.

The undisputed facts show there was no "sudden and complete breaking down or falling in or crumbling into pieces or into a heap of rubble or into a flattened mass," one of which is required by the policy for there to be a collapse. Also, the Grebows contend there was a "substantial impairment of the structure or building" and a "condition of imminent danger of collapse of a structure or building," but there are exclusions in the policy for such circumstances.

In *Rosen, supra,* 30 Cal.4th 1070, the Supreme Court held that under an insurance policy with similar language to the one in issue here, the policy did not cover an imminent collapse—just an actual collapse. In that case, the insurance policy defined

9

"collapse" as "actually fallen down or fallen to pieces."  (*Id.* at p. 1073.)  Here, the clause is "falling in or crumbling into pieces or into a heap of rubble or into a flattened mass."  There is no significant distinction between these two provisions.  The court in *Rosen* concluded that when the policy language was clear it could not rewrite the coverage to conform to public policy or the insured's expectations.  (*Id.* at pp. 1077-1080.)

The Grebows rely on *Panico v. Truck Ins. Exchange* (2001) 90 Cal.App.4th 1294.  In that case, as many as six ceiling tiles fell into the insured's storeroom damaging property.  Because the record was not clear on the size of the hole created as a result of the tiles falling, the court reversed what was the equivalent of a nonsuit, saying that there was enough evidence to make it reasonable to infer that a substantial portion of the structure fell making it a collapse of a part of the building.  Here, no portion of the Grebows's home or deck had collapsed.

In addition, in the instant case, there is an exclusion in the policy for a loss caused by "corrosion," "wear and tear," "deterioration" or "rust."  The uncontradicted evidence was that portions of the structure were replaced due to deterioration of the poles caused by rust.  Thus, various exclusions applied.  Accordingly, the policy did not cover what happened to the Grebows's residence.


### 2. *Reimbursement for Mitigation and Prevision of Imminent Loss*

The Grebows claim they are entitled to be reimbursed for their costs as mitigation.  They rely on the clause in the insurance policy that provides, "In case of a loss to which this insurance may apply, you must perform the following duties:  [¶] . . . [¶]  c.  protect property from further damage, make reasonable and necessary repairs required to protect the property, and keep an accurate record of your repair expenses."  Mercury argues that what the Grebows claim is mitigation is not covered because the clause applies after a loss occurs.

The mitigation clause is unambiguous.  The duty to mitigate arises "[i]n case of a loss to which this insurance may apply."  Here, the only loss to which the insurance may apply is a collapse, which as defined by the policy did not occur.  (See 3 New Appleman,

10

*supra,* § 20.06[4], p. 20-47 ["Because the duty to preserve or protect property is tantamount to a duty to mitigate damages, the duty on the part of the insured applies only after a covered loss occurs"].)

To read the policy as the Grebows do would mean that virtually all maintenance calculated to prevent ultimately an insurable loss would have to be reimbursed by the insurer. The parties could not possibly have intended that Mercury insured for deterioration or wear and tear thus converting their homeowner's insurance policy into a maintenance agreement. (*Murray v. State Farm Fire & Casualty Co.* (1990) 219 Cal.App.3d 58, 62.) Indeed, the policy excludes losses caused by wear and tear and deterioration, rust, or corrosion.

The Grebows argue that Mercury has an obligation to reimburse them for expenses to prevent an imminent insurable loss. Such an obligation has arisen from "sue and labor" clauses.[3] Our Supreme Court in *Young's Market Co. v. American Home Assur. Co.* (1971) 4 Cal.3d 309, at pages 313-314 (*Young's Market*) discussed the "sue and labor" clause as follows: "The 'sue and labor' clause appearing in most marine and inland marine insurance policies is of ancient lineage, its forebears extending back— according to a leading case on the subject—at least into the seventeenth century. (*Reliance Insurance Company v. The Escapade* (5th Cir. 1960) 280 F.2d 482, 488-489, fn. 11.) Such a clause makes express the duty implied in law on the part of the insured to labor for the recovery and restitution of damaged or detained property (Winter, Marine Insurance (3d ed. 1952) p. 393) and it contemplates a correlative duty of reimbursement separate from and supplementary to the basic insurance contract. 'Its purpose is to encourage and bind the assured to take steps to prevent a threatened loss for which the underwriter would be liable if it occurred, and when a loss does occur to take steps to diminish the amount of the loss. Under this clause the assured recovers the whole of the

---

[3]     "Sue and Labor clauses tend to cover the insured against the cost of preventing imminent loss, to the extent that such a loss would have been covered by the policy if it had occurred." (Abraham, *Peril and Fortuity in Property and Liability Insurance* (2001) 36 Tort Ins. L.J. 777, 791; see Ins. Code, § 1994.)

sue and labor expense which he has incurred . . . and without regard to the amount of the loss or whether there has been a loss or whether there is salvage, and even though the underwriter may have paid a total loss under the main policy.' (*White Star S. S. Co.* v. *North British & Merc. Ins. Co*. (E.D.Mich. 1943) 48 F.Supp. 808, 813; see *Reliance Insurance Company v. The Escapade, supra*, 280 F.2d 482, 488-489, fn. 11; 15 Couch on Insurance 2d (1966) § 55:123, p. 552; Vance on Insurance (2d ed. 1930) § 255, pp. 864-865.)"  In other words, the sue and labor clause applies when a party takes steps to prevent an imminent loss that would be covered if it occurred, such as a collapse.  The mitigation clause in the policy here is not the same as the usual sue and labor clause, which provides for preventative work by the insured "'[i]n case of actual or imminent loss or damage.'"  (*Young's Market, supra,* 4 Cal.3d at p. 311; see also 3 New Appleman, *supra,* § 20.06[2], pp. 20-46 to 20-47.)  As noted, the mitigation clause here only applies after the loss occurs.

The Grebows contend that in any event there is a common law duty of the insured to prevent an imminent insurance loss and a corresponding duty of the insurer to reimburse the insured for such mitigation costs.  This is an issue that has conflicting authorities.

The Grebows refer to the language in *Southern Cal. Edison Co. v. Harbor Ins. Co.* (1978) 83 Cal.App.3d 747, at page 759, which states the insured "was under a duty to prevent and mitigate insurable loss . . . .  The effect of the sue and labor clause in that regard was only to make express that *implied duty*."  (Italics added.)  According to the Grebows, this means they had a duty to prevent an insurable loss—the collapse—and should be compensated for such preventive work.  The court added that the "fulfillment of the duty to mitigate does not necessarily give rise to the obligation of reimbursement; only mitigation expenses which are for the primary benefit of the insurer in this case are recoverable under a sue and labor clause." (*Ibid.*)  The court held that there was no coverage under an express sue and labor clause because, although the work done may have prevented or mitigated loss to the structure, that work was not primarily for the benefit of the insurer, and the claim for reimbursement for in essence a design defect was

12

excluded from one of the policies and the damage took place prior to the date the policy became operative.  (*Id.* at p. 760.)  To the extent the enigmatic reference to an "implied duty" can be read to support the Grebows's position, it was dictum.

In *Young's Market, supra,* 4 Cal.3d 309, also cited by the Grebows, the insured transported liquor, which was confiscated by state authorities.  The insured sought from its insurer its legal expenses incurred to prevent the confiscation.  The policy excluded the risk of government seizure or confiscation.  As the loss would not have been covered, the preventive measures were not reimbursable.  The court said in regard to "multiple perils" insurance policy, a sue and labor clause "makes express the duty *implied in law* on the part of the insured to labor for the recovery and restitution of damages or detained property . . . and it contemplates a correlative duty of reimbursement separate from and supplementary to the basic insurance contract."  (*Id.* at p. 313, italics added.)

As in *Southern Cal. Edison Co. v. Harbor Ins. Co., supra,* 83 Cal.App.3d at page 759, to the extent the court's statement in *Young's Market, supra,* 4 Cal.3d at page 313, can be read to suggest there is some implied duty of reimbursement for preventive acts by the insured, the statement was dictum in that the court in *Young's Market* held that the sue and labor clause did not apply because the loss would not have been insurable.  Moreover, the court's discussion was in the context of a policy that contained an express sue and labor clause, which, as the court noted, generally was associated historically with marine insurance.  Such a clause is not in the Mercury policy.

There are other authorities that support the Grebows' position.  One authority, without case citation, says that "an insured may be reimbursed for the reasonable expenses incurred if it takes action and prevents a covered loss from occurring."  (3 New Appleman, *supra,* § 20.06[4], p. 20-47.)  One court in a widely-quoted statement said, "It would be a strange kind of argument and an equivocal type of justice which would hold that the defendant would be compelled to pay out, let us say, the sum of $100,000 if the plaintiff had not prevented what would have been inevitable, and yet not be called upon to pay the smaller sum which plaintiff actually expended to avoid a foreseeable disaster. . . .  [¶]  It is folly to argue that if a policy owner does nothing and thereby

13

permits the piling up of mountainous claims at the eventual expense of the insurance carrier, he will be held harmless of all liability, but if he makes a reasonable expenditure and prevents a catastrophe he must do so at his own cost and expense." (*Leebov v. United States Fidelity & Guaranty Co.* (Pa. 1960) 165 A.2d 82, 84.)

Appleman on Insurance said that to preclude reimbursement for preventive acts "tends to undermine the purpose of the provision to encourage insureds to take prompt and reasonable steps to prevent losses for the benefit of insurers. If there is no coverage for preventive efforts, an insured might decide to delay saving property until it has been damaged in order to trigger coverage. The insurer might have to pay for the insured's increased loss under these circumstances. The better holding is to allow recovery of expenses incurred to prevent a covered loss, as long as the policyholder believes the loss is imminent." (5 New Appleman, *supra,* § 45.02[4], p. 45-18; see 12 Couch on Insurance 3D (3d ed. 2005) § 178:10, pp. 178-16 to 178-18; see also Note, *Allocation of the Costs of Preventing an Insured Loss* (1971) 71 Colum. L.Rev. 1309, 1328 (Note) ["Close analysis demonstrates that there is no compelling reason why claims for prevention costs cannot be allowed in non-marine insurance cases when based on a quasi-contractual theory of recovery. [P]revention cost recovery should be limited to extraordinary cases—cases where extensive measures need to be undertaken, or where the cost to the insured is uncommonly high, or where the personal risk to the insured is great. For the courts to permit reimbursement in such cases not only meets normal standards of basic fairness, but promotes important societal values as well—a basic consideration in shaping any law"].)

There are, however, conflicting authorities. As noted by one authority (albeit dated), "Most courts, however, have not allowed an insured to recover prevention costs from the insurer without an express recovery provision." (Note, *supra,* 71 Colum. L.Rev. at p. 1316.)

In rejecting a claim for reimbursement for preventive measures, the court in *Swire Pacific Holdings, Inc. v. Zurich Insurance Company* (Fla. 2003) 845 So.2d 161, 169 said, "The reasoning suggested by [the insured] is certainly logical, to the effect that the

14

preventive measures may have conferred a benefit upon the insurance company. If the Sue and Labor clause had been worded differently or if it had included language concerning the prevention of loss, the conclusion may have been different. However, we must address the specific contract and specific facts before us to render our analysis." Similarly, in *W.M. Schlosser Co. v. Insurance Co. of North America* (Md. 1992) 600 A.2d 836, 839-840, the court in rejecting a claim for reimbursement for preventive measures, also disagreed with the conclusion of some courts that "'concepts of fairness and equity justify the construction of an insurance policy to provide coverage where none exists. [¶] This is not to say the court ignores the exigent circumstances involved or the obvious good faith efforts of the plaintiff. We, however, are no[t] empowered, in the guise of good faith and peculiar circumstances, to alter the terms of an otherwise unambiguous contract. The intention of the parties is the gravamen under ordinary contract principles.'"

After considering the various authorities, we conclude that absent a provision that provides for reimbursement, the insurer has no obligation to reimburse an insured for costs to *prevent an* imminent insurable occurrence from occurring. Here, we are not dealing with mitigation after insurable damage occurs. The policy does not provide for reimbursement to prevent imminent insurable occurrence. The policy provides, "We insure for direct physical loss to property . . . ." There is an exclusion for "neglect" which is defined as "meaning your failure to use all reasonable means to save and preserve property at and after the time of a loss." There is nothing about neglect before the loss or about reimbursement. There is nothing in the coverage provision of the policy that refers to reimbursement for preventive measures. As noted, the mitigation provision applies when a covered loss has occurred.

There is no implied obligation to reimburse an insured for costs to prevent an imminent insurance damage. "Implied terms are not favored in the law, and should be read into contracts only upon grounds of obvious necessity. (*Frankel* [*v. Board of Dental Examiners* (1996)] 46 Cal.App.4th [534,] 545.) A court may find an implied contract provision only if (1) the implication either arises from the contract's express language or

15

is indispensable to effectuating the parties' intentions; (2) it appears that the implied term was so clearly within the parties' contemplation when they drafted the contract that they did not feel the need to express it; (3) legal necessity justifies the implication; (4) the implication would have been expressed if the need to do so had been called to the parties' attention; and (5) the contract does not already address completely the subject of the implication.  [Citations.]"  (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1222 (*Corona*); see *Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 361-362 ["'We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there.'  [Citation.]  Courts may find an implied term in a contract only under 'limited circumstances' on grounds of '"obvious necessity"' 'where the term is "indispensable to effectuate the expressed intention of the parties"']; *Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 473 [declining to imply additional requirements into exclusive distributorship to give manufacturer flexibility to meet changing market conditions].)"]; see also *Rosen, supra,* 30 Cal.4th at p. 1080 [court should not "rewrite the coverage provision" to "compel the insurer to give more than it promised and would allow the insured to get more than it paid for"].)

Civil Code section 1655 provides in part:  "Stipulations which are necessary to make a contract reasonable . . . are implied, in respect to matters concerning which the contract manifests no contrary intention."  Civil Code section 1656 provides:  "All things that in law or usage are considered or incidental to a contract, or as necessary to carry it into effect, are implied therefrom, unless some of them are expressly mentioned therein, when all other things of the same class are deemed to be excluded."  The Grebows do not show how those sections would apply here.  (See *Corona, supra,* 172 Cal.App.4th at p. 1223.)

To imply an obligation to reimburse an insured for preventive acts would result in uncertainty as to when such an obligation can be enforced.  For example, if an insured has a hole in his or her roof, should he or she be able to obtain reimbursement for preventing water damage by fixing the roof?  If a tree is leaning ominously toward a house, is the cost of removing the tree reimbursable?  All maintenance is geared towards

16

preventing an insurable loss. To have to litigate the point at which maintenance becomes a reasonable step to prevent an imminent insurable loss is an undesirable way to deal with insurance coverage. Moreover, if insurers are responsible for such reimbursement, they will either raise the cost of insurance or attempt to insert even more explicit clauses precluding such exposure.

When an insured can prevent an insurable loss from occurring, he or she does so because he or she would rather have the house and property in it than insurance proceeds or reconstruction. The homeowner generally would rather stay in the house than have it reduced to rubble and not have to replace personal possessions. In marine insurance, a ship and its cargo do not belong to the master, and the insured can replace them quickly. But a homeowner has a considerable personal incentive to take corrective action to avoid the destruction of the house. (Note, *supra,* 71 Colum. L.Rev. at pp. 1324-1325.)

Some have suggested that even if there is no implied term for reimbursement, doctrines such as quasi-contract or unjust enrichment are applicable. (See *W.M. Schlosser Co. v. Insurance Co. of North America, supra,* 600 A.2d 839-840; Note, *supra,* 71 Colum. L.Rev. at pp. 1316-1328.) But, "it is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter." (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 203; see *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1389; *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 173; see also *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1420 ["When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract"].) Here the subject of the insurers' duties is covered by an insurance contract. Unjust enrichment and restitution are based on quasi-contract. (See *Federal Deposit Ins. Corp v. Dintino* (2008) 167 Cal.App.4th 333, 346; *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370; *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 388.) As noted, generally the homeowners would

17

do the preventive work for their own benefit. Just because the insurer may benefit also does not mean it was unjustly enriched. (See *Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 134 ["the 'mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor'"]; see also *Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 398; *Southern Cal. Edison Co. v. Harbor Ins. Co., supra,* 83 Cal.App.3d at p. 760.)

### 3. Estoppel

The Grebows assert that after they reported to Mercury the recommendations of the contractor and engineer that it was necessary to take action immediately to avoid a collapse and submitted a claim for reimbursement, Mercury did not communicate a position until four months later when it denied the claim. Actually, the work on the house had begun before any claim was made.

The Grebows cite *Reliance Insurance Company. v. The Escapade, supra,* 280 F.2d 482. That case involved a hull policy, covering a yacht and included a "sue and labor clause," as well as a warranty that prevented the yacht from being chartered without the permission of the insured—a pleasure use warranty. (*Id.* at p. 484.) The agent knew about the breach of the warranty that would void the policy, but did not inform the insured of that defense. Instead the agent refused to accept abandonment and declined to take action pursuant to the policy, thereby placing responsibility for salvage on the insured, and the agent directed salvage of the stranded yacht, ordered cleaning up and preventive work done on the yacht in a shipyard. Thus, the insurer required that the insured mitigate his loss and salvage. The insured claimed mitigation expenses. (*Id.* at pp. 484-486.) The court held that the insurer was estopped from denying insured's claim for damage to the yacht because the insurer ordered the insured to do work without disclosing the defense based of the insured's breach of the warranty clause that the yacht could not be chartered or hired out without the insured's approval. (*Id.* at p. 490.) The court suggested that the insurer at least implied there would be coverage if the insured

mitigated losses and the insured relied upon the insurance agent's requirement of preventive work. (*Ibid.*)

*Reliance Insurance Company. v. The Escapade, supra,* 280 F.2d 482 has no applicability here because Mercury did not demand anything of the Grebows or suggest that the claim would be covered if the Grebows mitigated prospective damages. Also in that case the damages had already occurred. Mercury took no action upon which the Grebows could or did rely. So estoppel is not applicable.

### 4. *Tortious Breach of Contract*

The Grebows' claim for tortious breach of contract is based on the contention that Mercury breached an implied covenant of good faith and fair dealing that is included in insurance contracts. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720.) As stated by the court in *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1151, in a claim against an insurance carrier, "there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." (See *Tilbury Constructors, Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 475.) We have held that the Grebows were not entitled to benefits. Thus, the requirements for a breach of the implied covenant of good faith and fair dealing have not been met. As the Supreme Court held in *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at page 35, there can be no claim under an implied covenant of good faith and fair dealing or for bad faith unless the policy benefits are due under the contract. We have held they are not. The trial court properly granted Mercury a summary judgment and denied the Grebows's motion for summary adjudication.

### 5. *New Trial Motion*

The Grebows moved for a new trial on the grounds that there was an error of law and that there were triable issues of fact. The Grebows essentially reargued the issues that were raised in the summary adjudication and summary judgment motions. They

introduced no new facts. The Grebows claim they were entitled to reimbursement because there was a possibility of coverage. But the trial court ruled, and we have held, there was no possibility of coverage. As noted, we review a denial of a motion for new trial after a summary judgment de novo. The trial court could not grant a new trial unless its original ruling, as a matter of law, was erroneous. (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 147; *Ramirez v. USAA Casualty Ins. Co.* (1991) 234 Cal.App.3d 391, 397.)[4] Thus, we affirm the denial of the motion for new trial.

## DISPOSITION

The summary judgment in favor of Mercury and denial of the Grebows's motion for summary adjudication and new trial are affirmed. Each party shall bear its or their own costs.

**CERTIFIED FOR PUBLICATION**

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.

---

[4] The Grebows' appeal on the motion for new trial may be affirmed based on an inadequate record. We also affirm the order on the merits.