Filed 1/7/26  Yeh v. Twitter CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HENRY YEH,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TWITTER, INC.,<br><br>    Defendant and Respondent. | A170843<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC23605100) |

This is an appeal from a judgment of dismissal after the trial court sustained the demurrer of defendant, Twitter, Inc. (Twitter),[1] to the class action complaint of plaintiff, Henry Yeh, without leave to amend.  The trial court found that plaintiff failed to allege facts sufficient to state a valid claim for breach of express or implied contract; violation of the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200 et seq.); or unjust enrichment.  The court further found that it was not reasonably probable that plaintiff could cure these defects if given the opportunity and, thus, dismissed the lawsuit. We agree and, thus, affirm.

---

[1] X Corp. is the successor in interest to Twitter.  To avoid confusion and for ease of reference, we refer to Twitter, as the named defendant, rather than to X Corp.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the complaint.[2]

### I.  *The Parties.*

Twitter is a Delaware corporation with its principal place of business in San Francisco, California.  Twitter "operates an online communication service through its website . . . and through text messaging and mobile applications."  This service allows "registered users to communicate with one another by posting 'tweets,' or short messages," with which "other users may interact through a 'like,' reply, or 'retweet.' "  "[T]o follow other accounts, or post, like, and retweet tweets, users must register for a Twitter account."

During the relevant time period, from May 2013 to September 2019, a user was required to provide either "an email address or phone number" in order to register for a Twitter account.  (Boldface omitted.)  If a registered

---

[2] We grant Twitter's unopposed motion to take judicial notice of the following documents previously judicially noticed by the trial court: (1) Twitter's terms of service; (2) Twitter's privacy policy (Privacy Policy); (3) the Federal Trade Commission (FTC) complaint; (4) the federal district court's order granting Twitter's motion to dismiss in *Price v. Twitter, Inc.* (N.D. Cal., 2022, No. 3:22-cv-0373-SK) (*Price*); and (5) the transcript of the hearing on the *Price* motion to dismiss.  (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 ["We must take judicial notice of matters properly noticed by the trial court"].)  We also grant Twitter's unopposed motion to take judicial notice of five documents consisting of filings and orders in the related federal actions of *Gianakopoulos v. Twitter, Inc.* (N.D. Cal., complaint filed 2022, No. 3:22-cv-04674-AGT) (*Gianakopoulos*); *McClellan v. Twitter, Inc.* (N.D. Cal., complaint filed 2022, No. 3:22-cv-04758-TSH) (*McClellan*); and *Price*.  (See *Jane Doe No. 1 v. Uber Technologies, Inc.* (2022) 79 Cal.App.5th 410, 415, fn. 1 [taking judicial notice of documents filed in federal lawsuit "alleging facts very similar to those alleged here"]; *Van Zant v. Apple Inc.* (2014) 229 Cal.App.4th 965, 969 & fn. 2 [taking judicial notice of "three of the MDL plaintiffs' master complaints" in related federal action].)  All other requests for judicial notice are denied as irrelevant to our resolution of the issues raised herein.

user sought to enable one of Twitter's security features, such as two-factor authentication (also called login verification) or account recovery, the user was asked to add either an email address or a phone number for the account. Nonregistered users, however, could access certain limited Twitter services, "such as searching and viewing public Twitter profiles," without providing any contact information.

Plaintiff, a resident of South San Francisco, maintained an active Twitter account during the relevant time period for which he "provided his telephone number and email address to Twitter for the purposes of login verification and account recovery."

## II.  *Twitter's Business Model.*

Twitter's services are free for registered users such as plaintiff. However, Twitter's "core business model monetizes user information by using it for advertising."  In fact, advertising is, by far, the largest source of Twitter's revenue, accounting for $2.99 billion of its total revenue of $3.4 billion.

Twitter provides advertising in the form of promoted tweets, accounts, or trends.  Twitter also provides two advertising services, " 'Tailored Audiences' " and " 'Partner Audiences,' " to its advertising partners.  Tailored Audiences allows advertisers to "target specific groups of Twitter users by matching the telephone numbers and email addresses that Twitter collects to the advertisers' existing lists of telephone numbers and email addresses." Partner Audiences allows advertisers to import marketing lists from data

3

brokers to "match against the lists of telephone numbers and email addresses collected by Twitter."[3]

According to plaintiff, from at least May 2013 to September 2019, Twitter "misrepresented" to registered users "the extent to which it maintained and protected the security and privacy of their Personal Information." Specifically, while Twitter "prompted users to provide a telephone number or email address for the express purpose of securing or authenticating their Twitter accounts," it "also used this information to serve targeted advertising and further its own business interests through its Tailored Audiences and Partner Audiences services." Plaintiff further alleged that "[he] valued his telephone number and email address and would not have provided them to Twitter without receiving value in exchange had he known this Personal Information would be used for marketing purposes, rather than for the login verification and account recovery purposes Twitter touted."

### III. *Twitter's Terms of Service and Privacy Policy.*

Twitter users agreed to and were bound by Twitter's terms of service and its incorporated Privacy Policy.[4]

The Privacy Policy informed users: "We use your contact information, such as your email address or phone number, to authenticate your account and keep it—and our services—secure, and to help prevent spam, fraud, and abuse. We also use contact information to personalize our services, enable certain account features (for example, for login verification or Twitter via

---

[3] According to the complaint, Twitter "has provided advertisers the ability to match against lists of email addresses since January 2014 and lists of telephone numbers since September 2014."

[4] The Privacy Policy is attached to the complaint as exhibit 1.

4

SMS), and to send you information about our services.  If you provide us with your phone number, you agree to receive text messages from Twitter to that number as your country's laws allow.  Twitter also uses your contact information to market to you as your country's laws allow, and to help others find your account if your settings permit, including through third-party services and client applications.  You can use your settings for email and mobile notifications to control notifications you receive from Twitter.  You can also unsubscribe from a notification by following the instructions contained within the notification or here."  (Privacy Policy, § 1.3, boldface omitted.)

Elsewhere, the Privacy Policy explained to users that it "use[s] the information described in this Privacy Policy to help make our advertising more relevant . . . ."  (Privacy Policy, § 2.6.)  However, users could control how Twitter collects and uses their information by adjusting their personalization and data settings to decide "[w]hether we show you interest-based ads on and off Twitter" and "review" which advertisers "have included you in tailored audiences to serve you ads."  (Privacy Policy, § 2.10.)

More information regarding Twitter's sharing or disclosure of personal information was given in Privacy Policy section 3.1:  "*We share or disclose your personal data with your consent or at your direction*, such as when you authorize a third-party web client or application to access your account or when you direct us to share your feedback with a business. . . . [¶] *Subject to your settings, we also provide certain third parties with personal data to help us offer or operate our services.  For example, we share with advertisers the identifiers of devices that saw their ads, to enable them to measure the effectiveness of our advertising business.  We also share device identifiers, along with the interests or other characteristics of a device or the person using it, to help partners decide whether to serve an ad to that device or to enable*

5

*them to conduct marketing, brand analysis, interest-based advertising, or similar activities.* You can learn more about these partnerships in our Help Center, and you can control whether Twitter shares your personal data in this way by using the 'Share your data with Twitter's business partners' option in your Personalization and Data settings. (This setting does not control sharing described elsewhere in our Privacy Policy, such as when we share data with our service providers.) The information we share with these partners does not include your name, email address, phone number, or Twitter username, but some of these partnerships allow the information we share to be linked to other personal information if the partner gets your consent first." (Boldface omitted, italics added.)

**IV.** *FTC Action.*

In October 2019, Twitter announced that it had inadvertently used contact information that registered users provided in enabling a security feature in its Tailored Audiences and Partnered Audiences programs. However, "[n]o personal data was ever shared externally with [its advertising] partners or any other third parties."

On May 25, 2022, the FTC filed a complaint against Twitter alleging that while Twitter represented to users that it collected their phone numbers and email addresses to secure their accounts, the company failed to disclose "that it also used user contact information to aid advertisers in reaching their preferred audiences." The FTC's complaint alleged that Twitter's misrepresentations violated both the Federal Trade Commission Act (Act; 15 U.S.C. § 41 et seq.) and a 2011 order of the FTC "which specifically prohibits [Twitter] from making misrepresentations regarding the security of

nonpublic consumer information."[5]  However, none of the claims raised against Twitter in the FTC's complaint required a showing of injury.

The same day the complaint was filed, the FTC announced Twitter had settled the complaint.  Under the settlement, the FTC made no finding of injury, wrongdoing, or liability, and Twitter agreed to pay a $150 million fine.

## V.     *Related Federal Lawsuits.*

Beginning in 2022, several class action lawsuits were filed in the United States District Court for the Northern District of California challenging the legality of Twitter's collection and use of its users' email addresses and phone numbers for marketing and advertising purposes.

For example, in May 2022, a putative class action, *Price*, was filed, asserting causes of action for breach of implied and express contract, violations of the UCL, and unjust enrichment.  According to the *Price* complaint, Twitter misrepresented or failed to disclose to its users the fact that the personal information users provided for the purpose of securing their accounts was actually used for marketing and advertising purposes.

On December 6, 2022, the federal court in *Price* granted Twitter's motion to dismiss with leave to amend.  The court found the named plaintiff lacked standing under article III of the federal Constitution and the UCL because she failed to adequately allege suffering an " 'injury in fact' " as a result of Twitter's disclosure of her personal information.

On August 15, 2022, the same day Twitter filed its motion to dismiss in *Price*, a group of plaintiffs that included our plaintiff, Henry Yeh, filed *Gianakopoulos.*  A few days later, separate plaintiffs then initiated another

---

[5] In 2011, Twitter settled allegations that it misrepresented the extent to which it protects the privacy and security of nonpublic consumer information.

follow-on action, *McClellan*. Both actions were reassigned to the same federal magistrate judge presiding over *Price*, who then consolidated all three actions after finding their overlapping claims and classes would make individual actions burdensome and inefficient.

In February 2023, a consolidated amended complaint was filed in *Price*, *Gianakopoulos*, and *McClellan* which dropped our plaintiff Yeh as a named plaintiff.

## VI. *Plaintiff Files the Present Action.*

On March 10, 2023, plaintiff filed the class action complaint in this action on behalf of himself and all others similarly situated asserting the same causes of action asserted in *Price*: (1) breach of express contract, (2) breach of implied contract, (3) violations of the UCL, and (4) unjust enrichment. By this complaint, plaintiff sought: (1) class certification and his appointment as class representative; (2) compensatory damages; (3) nominal damages; (4) nonrestitutionary disgorgement of "profits that were derived, in whole or in part, from Twitter's collection and subsequent use of Plaintiff's and the Class Members' Personal Information"; (5) disgorgement of wrongfully obtained revenues and profits; (6) an order enjoining Twitter's unlawful conduct; and (7) recovery of reasonable costs and expenses.

Through his complaint, plaintiff alleged, similarly to the federal plaintiffs, that, since 2013, Twitter failed to abide by its contractual duties by using its registered users' email addresses and telephone numbers for marketing purposes without their permission. Plaintiff alleges these users provided their email addresses and phone numbers to Twitter only for security and authorization purposes and were not informed this information would be shared with advertisers. Plaintiff thus sought to represent a nationwide putative class encompassing every individual who "provided his

8

or her telephone number(s) and/or email address(es) . . . to Twitter for purposes of two factor authentication, account recovery, and/or account reauthentication.[6]

In April 2023, Twitter removed this action to federal court. Once there, Twitter moved for dismissal. Plaintiff, in turn, moved for remand back to state court. The federal court granted plaintiff's remand motion and terminated Twitter's motion to dismiss as moot.

## VII. *Demurrer and Ruling on Demurrer.*

On March 26, 2024, Twitter demurred to the complaint, arguing none of plaintiff's claims stated facts sufficient to constitute a cause of action. In addition, Twitter separately moved to strike plaintiff's requests for nonrestitutionary disgorgement and injunctive relief. A hearing on both the demurrer and the motion to strike was held May 31, 2024.

On the same day, the trial court issued an order sustaining Twitter's demurrer without leave to amend. The court reasoned (inter alia) that (1) plaintiff failed to allege facts sufficient to establish a breach of express contract because the alleged breach "is directly contradicted by the unambiguous language" of the parties' contract; (2) plaintiff failed to allege facts sufficient to establish a breach of implied contract because the alleged terms of the implied contract are contradicted by the terms of the parties' express contract; (3) plaintiff failed to allege "cognizable economic harm" as required for a party to have standing to bring a claim for UCL violations; (4) plaintiff failed to state a claim for unjust enrichment, which is not an independent cause of action in California; and (5) alternatively, construing

---

[6] Plaintiff alleges this putative class consists of "millions of individuals" who provided a telephone number or email address to enable two-factor authentication, for account recovery purposes, or in response to a prompt for reauthentication.

9

the unjust enrichment claim as a quasi-contract claim, the claim does not " 'lie where, as here, express binding agreements exist and define the parties' rights.' "

The court also found no reasonable probability that plaintiff could cure these defects if he were allowed to amend. The court reasoned that plaintiff had effectively been given the opportunity to amend but that he failed to seize upon it when, after the federal court dismissed his "substantially identical complaint" in *Price*, he abandoned the federal action and "refiled in this Court . . . ."

Finally, the court granted Twitter's motion to strike plaintiff's requests for nonrestitutionary disgorgement and injunctive relief. The court reasoned that nonrestitutionary disgorgement is unavailable under the UCL and injunctive relief is unavailable in the absence of an allegation of "ongoing risk of continued harm from Defendant's past conduct."

On June 13, 2024, judgment of dismissal was entered on the complaint. Plaintiff timely appealed.

## DISCUSSION

Plaintiff challenges the trial court's decision to sustain Twitter's demurrer to his class action complaint without leave to amend after finding he failed to state valid claims for breach of express or implied contract, violation of the UCL, or unjust enrichment. Plaintiff also contends the trial court abused its discretion by not allowing him to amend the complaint to cure any purported defect. Lastly, plaintiff contends the trial court erred by granting Twitter's motion to strike his requests for disgorgement of wrongly

10

obtained profits and injunctive relief.  We address these contentions and Twitter's responses in turn *post*.[7]

## I.    *Standards of Review.*

We review de novo a judgment of dismissal entered after an order sustaining a demurrer.  (*Bichai v. Dignity Health* (2021) 61 Cal.App.5th 869, 876.)  We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law.  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; *Bichai, supra*, at p. 877.)  We also consider matters that may be judicially noticed.  (*Blank v. Kirwan, supra*, at p. 318.)  We affirm if there are any grounds upon which a demurrer may be sustained, regardless of the specific grounds relied upon by the trial court.  (*Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1031.)  We reverse if the facts alleged would entitle plaintiff to relief under any possible legal theory.  (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497.)

Once a demurrer is sustained, we review an order denying leave to amend for abuse of discretion.  (*Ashlan Park Center LLC v. Crow* (2015) 233 Cal.App.4th 1274, 1278.)  We must decide whether there is a reasonable possibility that the defect in the pleading can be cured by amendment.  If no such possibility exists, there was no abuse of discretion.  (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318.)  Plaintiff bears the burden on appeal to prove there is a reasonable possibility the defect can be cured.  (*Ibid.*)

We also review an order granting a motion to strike for abuse of discretion.  (*Ruiz v. Musclewood Investment Properties, Inc.* (2018) 28

---

[7] We have received and considered the amicus curiae brief submitted by the Civil Justice Association of California, which for the most part echoes Twitter's arguments in seeking affirmance.

Cal.App.5th 15, 24.)  If the order is within the bounds of reason, we uphold it. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.)

## II.  *Plaintiff failed to plead facts showing breach of contract.*

Plaintiff alleges Twitter breached its contractual promise under Privacy Policy section 3.1 to disclose a user's personal information "only 'with your consent or at your direction' " in the following ways: (1) failing to fully disclose to users what data Twitter collected and how Twitter used that information; (2) failing to give users " 'meaningful control' " through their account settings to limit the information Twitter collected and used; and (3) sharing or disclosing users' personal information without their knowledge or consent through its Tailored Audiences and Partner Audiences programs. As we will explain, none of these allegations suffices to state a valid claim for breach of the Privacy Policy.

California contract law is well established.  Courts interpret a contract to give effect to the mutual intention of the parties as it existed at the time of contracting as expressed in the contractual language.  (Civ. Code, § 1636; *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524.)  While the "intention of the parties is to be ascertained from the writing alone, if possible" (Civ. Code, § 1639), the "contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."  (Civ. Code, § 1647.)  Words used in the contract are given their ordinary meaning and viewed in the context of the entire contract so that each provision has effect.  (Civ. Code, §§ 1641, 1644.)  If the language is clear and unambiguous, it governs.  (Civ. Code, §§ 1638, 1644; *John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2024) 16 Cal.5th 1003, 1013.)

Contract language is ambiguous " ' "when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing.

12

[Citations.] An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence." ' " (*Mattei v. Corporate Management Solutions, Inc.* (2020) 52 Cal.App.5th 116, 125, fn. 8.) However, the "parol evidence rule generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument," meaning "a writing or writings constituting a final expression of one or more terms of an agreement." (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 13 (*Hayter*).) Thus, while "parol evidence may be admissible to determine whether the terms of a contract are ambiguous [citation], it is not admissible if it contradicts a clear and explicit policy provision [citation]." (*Hervey v. Mercury Casualty Co.* (2010) 185 Cal.App.4th 954, 961 (*Hervey*).)

" ' "When reviewing whether a plaintiff has properly stated a cause of action for breach of contract, we must determine whether the alleged agreement is 'reasonably susceptible' to the meaning ascribed to it in the complaint." ' " (*Aluma Systems Concrete Construction of California v. Nibbi Bros. Inc.* (2016) 2 Cal.App.5th 620, 624 (*Aluma Systems*).) " ' " ' "[W]e must accept as correct plaintiff's allegations as to the meaning of the agreement." ' " ' " (*Ibid.*; *Hayter, supra*, 18 Cal.App.4th at p. 12.) " ' " 'So long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement.' [Citation.]" ' " (*Marzec v. Public Employees' Retirement System* (2015) 236 Cal.App.4th 889, 909.) A court may sustain a demurrer to the complaint when the contract's terms expressly authorize the conduct at issue or are too vague to constitute an enforceable promise. (See *Hervey, supra*, 185 Cal.App.4th at pp. 965, 967–968; *Marzec*, at pp. 911–912.)

Thus, applying these principles, we begin with the contractual language. The Privacy Policy expressly provides, in several distinct provisions, that Twitter uses its users' personal information, including their email address and phone number, for security *and* advertising/marketing purposes. For example, the very first section instructs users that they need not create an account to use some of Twitter's services but that if "you do choose to create an account, you must provide us with some personal data so that we can provide our services to you." Section 1.3 then explains that Twitter uses a user's contact information, "such as [an] email address or phone number, to authenticate your account and keep it—and our services— secure," as well as "to market to you as your country's laws allow . . . ." Similarly, section 2.6 states that Twitter uses "the information described in this Privacy Policy to help make our advertising more relevant to you . . . and to help recognize your devices to serve you ads on and off Twitter." And section 3.1, entitled "Information We Share and Disclose," states that in "the limited circumstances where we disclose your private personal data, we do so subject to your control, because it's necessary to operate our services, or because it's required by law." (Boldface omitted.) This section also states that Twitter shares personal data "with your consent or at your direction," *subject to* "your [personalization and data] settings . . . ." To that end, section 2.10, entitled "How You Control Additional Information We Receive," sets forth the mechanism for users to control how Twitter uses their personal data, mainly by adjusting their accounts' personalization and data settings, which "let you decide" "[w]hether we show you interest-based ads on and off Twitter." (Boldface and underscoring omitted.)

These contract terms undermine plaintiff's primary allegation that Twitter promised to collect and use a user's personal information "only 'with

14

your consent or at your direction.'" On the contrary, Twitter openly disclosed that it collected and used users' personal information as a marketing tool to provide "more relevant" ads while also giving users the *option* to change their account settings to prevent Twitter from doing so. Thus, plaintiff's interpretation of the Privacy Policy as requiring Twitter to obtain users' consent in order to use their personal information for marketing or advertising is conclusively negated by the Privacy Policy's language. (*Aluma Systems, supra*, 2 Cal.App.5th at p. 624; see *Marzec, supra*, 236 Cal.App.4th at pp. 911–912 [demurrer was properly sustained when the contract's actual language failed to support plaintiffs' allegation of a promise to increase their future retirement benefits].)

While perhaps plaintiff could have demonstrated a breach of the Privacy Policy by alleging Twitter used users' data without their consent by disregarding their settings, he nowhere makes such allegation.

For example, in section 3.1, Twitter acknowledges "provid[ing] certain third parties with personal data to help us offer or operate our services" by "shar[ing] device identifiers, along with the interests or other characteristics of a device or the person using it, to help partners decide whether to serve an ad to that device or to enable them to conduct marketing, brand analysis, interest-based advertising, or similar activities. You can learn more about these partnerships in our Help Center, and you can control whether Twitter shares your personal data in this way by using the 'Share your data with Twitter's business partners' option in your Personalization and Data settings." (Underscoring omitted.) This provision continues: "The information we share with these partners does not include your name, email address, phone number, or Twitter username, but some of these partnerships

15

allow the information we share to be linked to other personal information if the partner gets your consent first."

Plaintiff alleges Twitter breached section 3.1 because users were unaware of what data Twitter was using or sharing. As the trial court noted, however, plaintiff's allegation is "contradicted by the express terms of the Privacy Policy, which provides [in section 2.10] that users may review '[a]dvertisers who have included you in tailored audiences to serve you ads.' " Plaintiff makes no allegation in this case that he attempted to review which advertisers included him in tailored audiences but that he was unable to access this information or was given misinformation by Twitter. Nor, as mentioned, does plaintiff allege that Twitter disregarded his chosen personalization and data settings. Finally, as the trial court also noted, plaintiff *concedes* he is not alleging Twitter " 'externally "disclosed" raw user contact information to third parties,' but only that it 'effectively "shared" such information by "aiding advertisers in reaching their preferred audiences." ' " Under these circumstances and in light of the express Privacy Policy language, we agree with the trial court that plaintiff failed to state a valid claim for breach of section 3.1.

We also reject plaintiff's reliance on language in the Privacy Policy's preamble as a way to show ambiguity regarding Twitter's contractual right to collect and use users' personal information. The preamble begins with a declaration that "[Twitter] believe[s] you should always know what data we collect from you and how we use it, and that you should have meaningful control over both." The preamble then explains that Twitter uses this data "for things like keeping your account secure and showing you more relevant . . . ads" and that users may "limit the data we collect from you and how we

use it, and . . . control things like . . . marketing preferences" through their account settings.

The preamble's introductory language is wholly consistent with, yet far less precise than, the language in sections 1.3, 2.6, and 3.1, which expressly states that Twitter may use its users' personal information for marketing (and other) purposes and that users can limit Twitter's use of this information by changing their account settings. As the trial court aptly stated in sustaining the demurrer, a "general aspirational statement" in the preamble cannot "override the repeated unambiguous statements in the Privacy Policy that Defendant may utilize users' contact information for marketing purposes" or "broaden [Twitter's] duties beyond the specific statements in the Privacy Policy that Defendant will abide by users' data sharing preferences in their account settings. (See, e.g., *Kashmiri* [*v. Regents of University of California* (2007)] 156 Cal.App.4th [809,] 834 [explaining that, typically, specific promises take precedence over general statements in a contract].)"

Moreover, while plaintiff relies on language in the preamble to allege Twitter's breach of the Privacy Policy, he fails to demonstrate this language is sufficiently clear and definite to create an enforceable promise by Twitter to its users to use their personal information for nonsecurity purposes "only 'with your consent or at your direction' " when, in fact, the Privacy Policy elsewhere states otherwise. Plaintiff's reliance is thus misplaced. (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770 ["To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for [affording a remedy]"].) "Courts will

17

not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18–19.)

Finally, we reject plaintiff's argument that extrinsic evidence should be considered because it confirms the reasonableness of his interpretation of the Privacy Policy as barring Twitter from using personal information for marketing purposes without users' consent. Specifically, plaintiff asks us to consider Twitter's announcement in 2019, many years after he registered with Twitter and became bound by the Privacy Policy, that the company had inadvertently used contact information provided by users for the purpose of securing their accounts to send targeted ads. We decline to do so. As explained *ante*, while extrinsic evidence may be considered to determine whether the terms of a contract are ambiguous, it is "not admissible if it contradicts a clear and explicit [contract] provision [citation]." (*Hervey, supra*, 185 Cal.App.4th at p. 961; accord, *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1167 [extrinsic evidence not admissible to "flatly contradict" the express terms of a contract]; cf. *Hayter, supra*, 18 Cal.App.4th at pp. 14, 18 [error to sustain a demurrer when plaintiff offered extrinsic evidence to support its allegation that when the parties formed the contract there was a widely recognized trade custom and usage prohibiting termination of a contract without good cause].)

As black letter law instructs, in deciding whether a plaintiff stated a valid cause of action for breach of contract, "we must first determine whether the contract language is reasonably susceptible to [plaintiff's] interpretation. If it is not, there is nothing more for us to decide. (Civ. Code, § 1638; [citation].)" (*Mueller v. Mueller* (2024) 102 Cal.App.5th 593, 598.) Here, it is not. As such, there is nothing more for us to decide.

18

## III. *Plaintiff failed to plead facts showing breach of implied contract.*

The trial court rejected plaintiff's implied contract claim as a matter of law after finding that any allegation that Twitter impliedly promised not to use his contact information for advertising purposes was inconsistent with the actual terms of the parties' express contract. This is correct.

" ' "As to the basic elements, there is no difference between an express and implied contract. While an express contract is defined as one, the terms of which are stated in words (Civ. Code, § 1620), an implied contract is an agreement, the existence and terms of which are manifested by conduct (Civ. Code, § 1621). . . . [B]oth types of contract are identical in that they require a meeting of minds or an agreement [citation]." ' " (*Allied Anesthesia Medical Group, Inc. v. Inland Empire Health Plan* (2022) 80 Cal.App.5th 794, 809 (*Allied Anesthesia*).)

" '[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter.' " (*Grebow v. Mercury Ins. Co.* (2015) 241 Cal.App.4th 564, 580 (*Grebow*), quoting *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 203.) " 'Implied terms are not favored in the law, and should be read into contracts only upon grounds of obvious necessity. [Citation.] A court may find an implied contract provision only if (1) the implication either arises from the contract's express language or is indispensable to effectuating the parties' intentions; (2) it appears that the implied term was so clearly within the parties' contemplation when they drafted the contract that they did not feel the need to express it; (3) legal necessity justifies the implication; (4) the implication would have been expressed if the need to do so had been called to the parties' attention; and (5) the contract does not already address

19

completely the subject of the implication.  [Citations.]' " (*Grebow, supra*, at pp. 578–579.)

Here, this standard is not met.  The Privacy Policy "address[es] completely" the subject of the alleged implied term, which is Twitter's collection and use of plaintiff's email address and phone number for marketing purposes.  (*Grebow, supra*, 241 Cal.App.4th at pp. 578–579.) "When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract."  (*Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1420.)

Plaintiff insists the Privacy Policy only addressed Twitter's collection and use of information collected when the user initially created a Twitter account.  Plaintiff alleges the parties subsequently agreed to a new, implied contract term "by which [Twitter] agreed to utilize the Personal Information solely for the purposes expressed:  two-factor authentication, account recovery, and/or account re-authentication, and for no other purposes such as marketing and/or advertising."  According to plaintiff, "the Privacy Policy does not address information subsequently given [once the account is created] for specific account security purposes."

Plaintiff is wrong.  The Privacy Policy, in no uncertain terms, covers when and how Twitter would use his contact information, including for the express purpose of "keeping your account secure *and* showing you more relevant . . . ads." (Privacy Policy, Preamble, italics added.)  Elsewhere, the Privacy Policy reiterates:  "We use your contact information, such as your email address or phone number, to authenticate your account and keep it . . . secure . . . .  Twitter also uses your contact information to market to you as

20

your country's laws allow . . . ." (Privacy Policy, § 1.3) And elsewhere: "We use information you provide to us and data we receive . . . to make inferences like what topics you may be interested in [and] how old you are . . . . This helps us . . . personalize the content we show you, including ads." (Privacy Policy, § 2.4, underscoring omitted.) Collectively, this language covers Twitter's use of information for both security and advertising/marketing purposes.

Plaintiff also ignores the Privacy Policy's straightforward instructions on how to limit Twitter's collection and use of users' contact information, specifically, by exercising "control through your <u>settings</u> . . . ." (Privacy Policy, Preamble.) It further states: "If you have registered an account on Twitter, we provide you with tools and account settings to access, correct, delete, or modify the personal data you provided to us and associated with your account." (Privacy Policy, § 4.1.)

Yet, nowhere in the Privacy Policy is there language suggesting the parties' intent to treat differently contact information collected from a user at the time of account creation and such information collected after account creation, when a user takes additional steps to secure their account. Given the law's disfavor of implied terms, we decline to read into the Privacy Policy any such distinction in the absence of an allegation of " 'obvious necessity.' " (*Grebow, supra*, 241 Cal.App.4th at p. 578.) " 'In construing a contract . . . [t]he court does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which one of the parties now wishes were there. [Citations.] Courts will not add a term about which a contract is silent.' [Citation.]" (*California Union Square L.P. v. Saks & Co. LLC* (2021) 71 Cal.App.5th 136, 146.)

21

Under these circumstances, the trial court appropriately sustained Twitter's demurrer to the implied contract cause of action in plaintiff's complaint. "[T]here simply cannot exist a valid express contract on one hand and an implied contract on the other, each embracing the identical subject but requiring different results and treatment." (*Tollefson v. Roman Catholic Bishop* (1990) 219 Cal.App.3d 843, 855; accord, *Allied Anesthesia, supra*, 80 Cal.App.5th at p. 809 [affirming dismissal when the allegations in the complaint failed to "exhibit any mutual consent as to an essential term of the alleged implied contract. (Civ. Code, § 1580 [Mutual consent only exists when 'the parties all agree upon the same thing in the same sense.'].)"

## IV. *Plaintiff failed to plead facts demonstrating his standing to bring a UCL claim against Twitter.*

Plaintiff likewise failed to state a valid claim for violations of the UCL. A private plaintiff has standing to bring a UCL claim only if the plaintiff "has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204.) The California Supreme Court has interpreted this language to mean a UCL plaintiff must have suffered a "loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury . . . ." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320–322 (*Kwikset*).) Here, this standard is not met.

As *Kwikset* explains: "There are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." (*Kwikset, supra*, 51 Cal.4th at p. 323.)

22

Plaintiff sought to show economic injury based on the third of these categories, specifically, "the loss of money and/or property as a result of Twitter's . . . unauthorized disclosure and use of their Personal Information which has value as demonstrated by its use for targeted advertising by Twitter." To that end, the complaint alleged that Twitter's actions deprived plaintiff and the other class members of their property right to control the dissemination and control of their personal information, leading to a "diminution of the value of their private and personally identifiable data and content." According to the complaint, plaintiff "valued his telephone number and email address and would not have provided them to Twitter without receiving value in exchange had he known his Personal Information would be used for marketing purposes, rather than for the [security] purposes Twitter touted." The complaint also pointed to unidentified marketing companies and consultants which allegedly placed the value of an individual's email address at "around $33" and an individual's telephone number at "$100.87." On this basis, the complaint sought "restitution and disgorgement of [Twitter's] unjust profits and revenues."

These allegations do not suffice to demonstrate standing under the UCL because they omit any allegation that plaintiff suffered an *actual* loss of money or tangible property. (*Kwikset, supra*, 51 Cal.4th at p. 325 [UCL plaintiff must allege "an identifiable monetary or property injury"].) Even assuming plaintiff is correct that his email address and phone number generated an economic benefit for Twitter through its advertising programs, this fact does not, without more, demonstrate plaintiff suffered a corresponding economic loss. (E.g., *Fogelstrom v. Lamps Plus, Inc.* (2011) 195 Cal.App.4th 986, 994 (*Fogelstrom*) [plaintiff's allegations failed to demonstrate an "injury in fact" within the meaning of the UCL because,

23

while plaintiff's home address had "value to Lamps Plus, such that the retailer paid Experian a license fee for its use, [this] does not mean that its value to plaintiff was diminished"].)

As the trial court explained, a long line of state and federal cases holds that misappropriation of a person's private information alone does not constitute economic injury. *Moore v. Centrelake Medical Group, Inc.* (2022) 83 Cal.App.5th 515 (*Moore*) is illustrative. There, the appellants sued for breach of contract and violation of the UCL (inter alia) after their personal identifying information (PII) was stolen as a result of the medical provider's data breach. The appellants' complaint alleged "they suffered '[a]scertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market.' " (*Id*. at p. 522.) The complaint was dismissed without leave to amend on demurrer. (*Id*. at p. 520.)

On appeal, the reviewing court partially reversed, holding it was error to dismiss the appellants' UCL and breach of contract claims. (*Moore, supra*, 83 Cal.App.5th at p. 520.) In doing so, however, the court rejected the plaintiffs' "lost-value-of-PII theory" as a basis for UCL standing, explaining: "We need not accept as true appellants' allegation that they suffered '[a]scertainable losses in the form of deprivation of the value of their PII,' as this constitutes a conclusion or deduction, unsupported by any properly pleaded facts. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs [(The Rutter Group 2021)] ¶ 8:136.) Appellants properly pleaded only that their PII was stolen and disseminated, and that a market for it existed. They did not allege they ever attempted or intended to participate in this market, or otherwise to derive economic value from their PII. Nor did they allege that any prospective purchaser of their PII might learn that their PII

24

had been stolen in this data breach and, as a result, refuse to enter into a transaction with them, or insist on less favorable terms. In the absence of any such allegation, appellants failed to adequately plead that they lost money or property in the form of the value of their PII." (*Id.* at p. 538.)

Similarly, in *In re Google Inc.* (3d Cir. 2015) 806 F.3d 125, the plaintiffs brought a class action lawsuit alleging the defendants engaged in an illegal scheme to maximize advertising revenue by deploying cookies to circumvent users' browser settings to enable tracking of their Web communications without their consent. The Third Circuit Court of Appeals affirmed dismissal of the plaintiffs' UCL claim based on their failure to show injury in fact. The court explained that, even assuming the plaintiffs were correct the defendants "have taken the value of [the plaintiffs' personal] information for themselves," the plaintiffs "d[id] not allege that they sought to monetize information about their internet usage"; that "they ever stored their information with a future sale in mind"; or "that they incurred costs, lost opportunities to sell, or lost the value of their data as a result of their data having been collected by others." (*Id.* at pp. 148–149, 152.)

Applying the same reasoning here, the trial court dismissed plaintiff's UCL claim for lack of injury in fact based on his failure to allege that he could sell his phone number and email address for money or that it otherwise had economic value to him " 'as opposed to the value that Twitter gained by aggregating [his] data' " with that of others. We agree with this conclusion. (*Moore, supra*, 83 Cal.App.5th at p. 538; *Fogelstrom, supra*, 195 Cal.App.4th at p. 994; accord, *Archer v. United Rentals, Inc.* (2011) 195 Cal.App.4th 807, 816 [no UCL standing when "plaintiffs essentially claim the unfair business practice is the unlawful collection and recordation of their personal

identification information" but fail to demonstrate "how such privacy violation translates into a loss of money or property"].)

Seeking to avoid this conclusion, plaintiff points to an alternative "benefit of the bargain" theory to prove injury in fact. Plaintiff claims that he and other class members paid "valuable consideration in the form of the Personal Information they agreed to share" yet received no such valuable consideration in return from Twitter. (*Kwikset, supra*, 51 Cal.4th at p. 323 [plaintiff may also demonstrate economic injury from unfair competition by establishing he or she "surrender[ed] in a transaction more, or acquire[d] in a transaction less, than he or she otherwise would have"].) We disagree. Even assuming plaintiff is correct that Twitter obtained an economic benefit from utilizing its users' personal information for marketing or advertising purposes, plaintiff disregards the fact that he and other users paid nothing for their use of Twitter's online communication services. Under these circumstances, plaintiff fails to demonstrate he and other proposed class members surrendered more or received less than they otherwise would have. (Cf. *Moore, supra*, 83 Cal.App.5th at p. 527 [UCL standing adequately pleaded when "appellants alleged they relied on [defendant's] false representations and promises concerning data security in entering contracts with [defendant] and accepting its pricing terms, paying more than they would have had they known the truth [about its practices]"].) Accordingly, we reject plaintiff's alternative theory as a basis to demonstrate standing under the UCL, such that dismissal of his claim was appropriate.

## V. *Plaintiff failed to state a valid claim for unjust enrichment.*

Plaintiff also raised an unjust enrichment claim as an alternative to his breach of contract and implied contract claims. To support this claim, plaintiff alleged Twitter acquired a benefit that he and class members

26

conferred on it, mainly their contact information, through inequitable means by "fail[ing] to disclose all the purposes for which it would use the [information], and misrepresent[ing] those uses."  To remedy this conduct, plaintiff asked the court to compel Twitter to disgorge into a common fund or constructive trust the "proceeds that it unjustly received—specifically all revenue related to the targeted advertising and/or marketing that utilized the improperly obtained Personal Information" for the benefit of plaintiff and the other proposed class members.

The trial court found plaintiff failed to state a valid claim for unjust enrichment because unjust enrichment is "not a stand alone cause of action." Moreover, even if construed as " 'a quasi-contract claim for unjust enrichment,' " such claim would not lie because a binding contract exists between the parties defining their respective rights with regard to the use of plaintiff's personal information.  We agree with this analysis.

" 'Unjust enrichment is not a cause of action'; it is 'just a restitution claim.' " (*De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 870; accord, *Everett v. Mountains Recreation & Conservation Authority* (2015) 239 Cal.App.4th 541, 553 [" 'there is no cause of action in California for unjust enrichment' "].)  Thus, in the absence of an actionable wrong, such as here, there is no basis for restitutionary relief.  (*De Havilland, supra*, at p. 870.)

Nor can plaintiff avoid this roadblock by recasting his unjust enrichment claim as a quasi-contract claim.  "[A]s a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights.  [Citations.]  'When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract.'

27

[Citation.]" (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 172, fns. omitted.)  Thus, plaintiff may not proceed on a quasi-contract claim because the subject matter of his claim, to wit, whether Twitter was unjustly enriched by misusing his contact information for advertising purposes, was governed by the parties' binding contract—the Privacy Policy.[8]

## VI. *Plaintiff fails to demonstrate a reasonable probability of curing the defects in the complaint.*

Lastly, we consider whether plaintiff presents facts demonstrating a reasonable possibility that the identified defects in the complaint could be cured by amendment.  (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318.)  "Unless a complaint is 'incapable of amendment,' leave to amend should be 'liberally allowed as a matter of fairness' where a plaintiff has received no opportunity to amend after a demurrer."  (*JPMorgan Chase Bank, N.A. v. Ward* (2019) 33 Cal.App.5th 678, 684, citing *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 746.)

The trial court, denying leave to amend, explained that plaintiff "previously filed a substantially identical complaint in federal court, suffered an adverse ruling, amended the complaint and then, in a transparent effort at judge-shopping, voluntarily dismissed the federal action with a second motion to dismiss pending and refiled in this Court, without any effort to cure the defects that caused the federal court to dismiss the prior complaint."  Our review of the record and the judicially noticed documents confirms this analysis.

---

[8] Because we reject plaintiff's claim as a matter of law, whether framed as one for unjust enrichment or quasi-contract, we also reject his subordinate argument that leave to amend should be granted to permit him to recast his unjust enrichment claim as a quasi-contract claim.

28

Plaintiff has had several opportunities to amend his various complaints to allege a valid theory of liability, yet he has not been able to do so. (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318 ["The burden of proving [a] reasonable possibility [of curing defects in the complaint] is squarely on the plaintiff"].) And, given the significant legal barriers to plaintiff's claims identified herein and in the well-reasoned orders of our federal and state court colleagues, we find no basis to disturb the judgment.

In reaching this conclusion, we acknowledge plaintiff's newly raised argument on appeal that amendment should be permitted to allow him to allege the following new "facts": (1) "he set his privacy settings to indicate he did not consent to sharing his private information," and (2) he intended to "participate in the market for his personal information and the impairment of his ability to do so because of Twitter's breach . . . ."[9] Neither of these "facts" warrants reversal.

## A. New Fact Regarding Plaintiff's Privacy Settings.

As to the new "fact" regarding plaintiff's privacy settings, his dismissed complaint already alleged that "Twitter did not give its users 'control through your settings to limit the data we collect from you and how we use it'; and most importantly Twitter did 'share or disclose [users'] personal data' without their 'consent or at [users'] direction; all contrary to the the Privacy Policy." (*Sic*.) The trial court found these allegations insufficient to prove breach of contract because: "The Privacy Policy unambiguously provides only one mechanism for users to control their personal data: Twitter's settings. [Privacy Policy, § 1.3.] Moreover, Section 2.10, entitled 'How You Control

---

[9] A plaintiff can attempt to meet its burden of proving a reasonable probability of curing defects in a complaint by introducing new "facts" for the first time on appeal. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 890 (*Cantu*).)

Additional Information We Receive,' explains in part that Twitter's 'data settings let you decide . . . whether we show you interest-based ads on and off Twitter.' [Citation.] Thus, in order to share Plaintiff's data 'without his consent,' Defendant would have had to share personal data by disregarding Plaintiff's Twitter settings. *However, at no point does Plaintiff allege that Defendant did so.*" (Italics added.)

On appeal, plaintiff still does not make such allegation. Rather, plaintiff nebulously states that if given the opportunity to amend, he "would specifically allege his privacy settings on his Twitter account during the relevant time period, such that any use of his contact information for targeted advertising was without his consent," and, similarly, that he would allege "he set his privacy settings to indicate he did not consent to sharing his private information . . . ." However, missing from plaintiff's proposed allegations are any specific facts that, if accepted as true, would establish a breach of contract.

In particular, Twitter agreed in the Privacy Policy to abide by its users' data sharing preferences as indicated in their personalization and data settings. While plaintiff seeks leave to "specifically allege his privacy settings," plaintiff has never alleged, and does not allege here, that Twitter, in breach of the Privacy Policy, disregarded or failed to abide by his data sharing preferences as indicated in his account settings. As such, his proposed amendment fails. To prove a reasonable probability of curing the defects in his complaint, plaintiff "must show in what manner he can amend his complaint and how that amendment will change the *legal effect* of his pleading." (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349, italics added.) Plaintiff has not made this showing. (*JPMorgan Chase Bank, N.A. v. Ward, supra*, 33 Cal.App.5th at p. 689 [to prove a reasonable probability of curing

30

defects in a dismissed complaint, it is not enough that plaintiff "*could* assert a viable theory"]; *Safe Life Caregivers v. City of Los Angeles* (2016) 243 Cal.App.4th 1029, 1050 [while appellants make "occasional references . . . to [new] facts that might be alleged if leave to amend were granted," the court found "no factual allegations that appellants could make that could state a cause of action"].)

## B. New Fact Regarding Market Participation.

We reach the same conclusion with respect to plaintiff's second new "fact"—that he "inten[ded] to participate in the market for his personal information." Even if we were to assume such a market existed and that plaintiff intended to participate in it, he makes no allegation that his participation in this market was rendered worthless or less valuable because Twitter already shared his personal information with its advertising partners. In the absence of any such allegation, plaintiff fails to demonstrate a legally cognizable injury under the UCL. (*Kwikset, supra*, 51 Cal.4th at p. 325 [UCL plaintiff must allege "an identifiable monetary or property injury"].)

## C. Plaintiff Forfeited Two New Legal Arguments.

Finally, plaintiff, in his reply brief, raises for the first time two new legal theories as grounds for reversing dismissal. "[B]eg[ging] leave to amend," he alleges the Privacy Policy "is illegal and unconscionable under California law" because the Privacy Policy (1) violates his constitutional right to privacy and (2) constitutes a contract of adhesion. These arguments are forfeited.

While a plaintiff is permitted to raise a new theory on appeal from an order denying leave to amend (*Cantu, supra*, 4 Cal.App.4th at p. 890), an appellate court ordinarily will not consider points raised for the first time in a

31

reply brief or at oral argument "because such consideration would deprive the respondent of an opportunity to counter the argument." (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453; *New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co.* (1992) 7 Cal.App.4th 1088, 1098 [declining to consider a new theory raised at oral argument as grounds for finding the trial court abused its discretion in denying leave to amend]; accord, *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10 ["Obvious reasons of fairness" militate against the court's considering an argument raised for the first time in a reply brief].) Because plaintiff's failure to raise these new legal theories in the trial court or in his opening brief deprived Twitter of the opportunity to address them, we decline to consider whether, based on these theories, he could amend the complaint to state a valid claim.

Accordingly, for the reasons stated, we conclude plaintiff failed to satisfy his burden on appeal to show how the facts he alleged below or in his appellate briefs demonstrate a reasonable probability that he could successfully amend his complaint if given the opportunity. Dismissal of the complaint without leave to amend was a proper exercise of the trial court's discretion, and we decline to disturb it.[10]

## DISPOSITION

Judgment of dismissal is affirmed. Plaintiff shall bear costs on appeal.

Jackson, P. J.

WE CONCUR:

Burns, J.

Chou, J.                                                            A170843/*Yeh v. Twitter, Inc.*

---

[10] Because we affirm the trial court's dismissal of the complaint without leave to amend, we need not address plaintiff's separate challenge to the court's order striking the disgorgement and injunctive relief allegations from the complaint.